

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-26-1995

# Waldron v SL Industries, Inc.

Precedential or Non-Precedential:

Docket 94-5282

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Waldron v SL Industries, Inc." (1995). *1995 Decisions.* Paper 145.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/145

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-5282

_____

REED WALDRON

Appellant,

vs.

SL INDUSTRIES, INC.; SL-WABER, INC.

Appellees.


_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 92-cv-05445)

_____


ARGUED JANUARY 25, 1995

BEFORE:  BECKER, LEWIS and GARTH, Circuit Judges.

(Filed May 26, 1995)

_____


Alice W. Ballard (ARGUED)
Samuel & Ballard
225 South 15th Street
Suite 1700
Philadelphia, PA  19102

     Attorney for Appellant

David B. Mulvihill (ARGUED)
Titus & McConomy
Four Gateway Center
20th Floor
Pittsburgh, PA  15222

Attorney for Appellees

Barbara L. Sloan
Equal Employment Opportunity Commission
1801 L Street, N.W.
Washington, DC  20507

Attorney for Amicus-appellant, Equal
Employment Opportunity Commission

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

The district court in this case predicted that, after St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993), we would require a plaintiff at summary judgment in a suit brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq., to prove both that his employer's reasons for terminating him were false and that the real reason for termination was discrimination.  Recent decisions of this court, including Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994), and Sempier v. Johnson & Higgins, No. 94-5208 (3d Cir. Jan. 6, 1995), have established that this prediction was inaccurate.  Because the district court's legal standard was thus in error, the principal

question for our review is whether under the proper standard, the defendant was entitled to summary judgment. In other words, provided that the plaintiff produced sufficient evidence to establish a prima facie case, did he also provide sufficient evidence upon which a reasonable jury could determine that either his employer's reasons for terminating him were false or that discrimination was more than likely the motivating factor? We find that the plaintiff, Reed Waldron, presented sufficient evidence to survive summary judgment, and therefore we will reverse.

I.

SL Waber, Inc., a subsidiary of SL Industries, Inc., manufactures machinery designed to protect sensitive electrical and electronic equipment. Reed Waldron was employed at Waber from 1972 through 1986, but was laid off in 1986 because of a reorganization. In 1989, after two years of work at a competitor of Waber, he was rehired by Waber as a consultant. He was 61 years old when he was rehired.

In July 1990, Waber found that the employee functioning as industrial market manager, Scott Hammill, was having difficulties. Thus, Waber decided to split the industrial market manager position into two positions separately devoted to marketing electronic equipment and electrical equipment. Hammill was given the electronic marketing manager's position, and Waldron was named electrical marketing manager. In spring of 1991, Hammill voluntarily left Waber, the positions were

reconsolidated, and Waldron was given the reconsolidated position of industrial market manager.

There is conflicting evidence about whether Waldron performed his tasks adequately in the industrial market manager position. Predictably, Waldron contended that he did a good job, but the company said that he did not vigorously pursue key accounts and performed poorly during a series of incidents related to preparation of and presentation to Waber's parent, SL Industries, of the fiscal year 1992 business plan.

In August 1991, just after the company adopted the 1992 business plan, Waldron was discharged -- at the age of 63. Kevin Woznicki, vice-president of sales and marketing, apparently told Waldron that his job had been eliminated, that his former duties were being distributed between two new positions -- electronics market manager and electrical market manager -- and that Waldron was "not the best candidate" for either position, principally because he did not go after key accounts. Although Woznicki apparently told Waldron he was terminated (Joint Appendix ("App.") 116), Woznicki first sought and received approval of the decision from Ronald Mazik, the company's president.

Shortly thereafter, Ed Brown, a telephone sales representative aged 32, was promoted to the electronics market manager's position -- that is, one half of Waldron's old job. The electrical market manager position (the other half) was never advertised or filled, and within a short time (five to six months) the company recombined the two positions with Brown in

the consolidated post -- again called industrial market manager, the title of Waldron's old job.

Waldron sued Waber, claiming that he had been discharged because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.,[1] and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq. ("LAD").[2] The company moved for summary judgment, arguing that, under the "pretext-plus" standard that it predicted we would adopt for dealing with summary judgment after Hicks,

---

[1]. Section 623(a)(1) of Title 29 of the United States Code provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

[2]. The LAD provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a.  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J. Stat. Ann. 10:5-12(a).

Waldron did not have sufficient evidence upon which a jury could find both that Waber's reasons for firing him were pretextual and that the real reason for the termination was age-related animus. The district court agreed, found that the ADEA and LAD claims were governed by the same standard, and rendered summary judgment in favor of the company. The district court had jurisdiction under 29 U.S.C. § 623(a) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

II.

A.

In St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993), the Supreme Court addressed a pervasive split that had developed among the courts of appeals over the proper application of the scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for allocating the burdens of production and presentation of proof in cases involving allegations of discrimination in violation of Title VII of the Civil Rights Act of 1964. Under the familiar shifting burdens analysis of McDonnell Douglas, a plaintiff must initially establish a minimal prima facie case -- essentially, that he or she is a member of a protected class and was qualified for an employment position, but that he or she was either not hired for that position or was fired from it "under circumstances that give rise to an inference of unlawful discrimination." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).[3] Once the plaintiff

---

[3]. As the Supreme Court made clear, the precise elements of a plaintiff's prima facie case may vary with the particular

establishes his or her prima facie case, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision.  If one or more such reasons are proffered, the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual -- that is, that they are false and that the real reason for the employment decision was discriminatory.

It was the meaning of this last phase of the McDonnell Douglas scheme that had caused dissention among the courts of appeals:  if a plaintiff proved that an employer's proffered reasons were unworthy of credence, must the jury return a verdict in his or her favor, or was it still required to find that discriminatory animus more than likely caused the employment decision?  In Hicks, resolving a circuit conflict, the Court decided that although "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination," so that if an employer's proffered reasons for the employment decision are rejected, "no additional proof of

(..continued)
circumstances.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.14 (1973); Teamsters v. United States, 431 U.S. 324, 335-36 & n.15 (1977); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 n.5 (1981).  See generally Torre v. Casio, Inc., 42 F.3d 825, 830-31 (3d Cir. 1994) ("the nature of the required showing to establish a prima facie case of disparate treatment by indirect evidence depends on the circumstances of the case" (internal quotation omitted)).

discrimination is required," nevertheless the ultimate burden of persuasion remains on the plaintiff throughout the case. Id. at 2749. Thus, "a plaintiff's proof of his or her prima facie case and proof that the employer's proffered reasons are false does not compel a judgment in the plaintiff's favor." Id.

Although Hicks resolved the issue of whether a plaintiff is entitled to judgment as a matter of law at trial if he or she establishes a prima facie case and discredits an employer's justifications for the employment decision, it did not address the standard by which summary judgment should be assessed in a pretext case under the ADEA.[4] The district court in this case noted that we had not yet ruled on this issue, but predicted that we would side with those courts of appeals that had required plaintiffs at summary judgment to produce evidence of "pretext-plus." Waldron v. SL Industries, Inc., 849 F. Supp. 996, 1004 n.11 (D. N.J. 1994). That is, the district court predicted that at summary judgment we would require plaintiffs to demonstrate" both that the employer's reasons are false and that the real reasons were discriminatory . . . ." Id.

Contrary to the district court's prediction, however, in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), we joined those of our sister circuits who have read Hicks to require at

_____

[4]. Although Hicks was a Title VII case, its analysis applies to ADEA cases, as well. See McKenna v. Pacific Rail Services, Inc., 32 F.3d 820, 825–26 & n.3 (3d Cir. 1994) (shifting burden analysis applicable to Title VII cases also applicable to cases under ADEA).

summary judgment "pretext-only."  Judge Becker noted in Fuentes that,

> [b]ecause the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, see Hicks, __ U.S. at __, 113 S. Ct. at 2749, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Fuentes, 32 F.3d at 764.

Thus, we clarified that "if the plaintiff has pointed to evidence sufficient[] to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case."  Fuentes, 32 F.3d at 764.  This standard is obviously different from that imposed by the district court, and it will be our responsibility on appeal to assess whether, under this standard, plaintiff's claims should have survived summary judgment.[5]

_____

[5].  Although Waber conceded at oral argument that the district court applied the incorrect legal standard under Fuentes and its progeny, the company sought in its brief to undercut the strength of Fuentes' precedential value by contending that it is inconsistent with two of our other recent decisions:  Seman v. Coplay Cement Co., 26 F.3d 428 (3d Cir. 1994), decided two months before Fuentes, and Armbruster v. Unisys Corp., 32 F.3d 759 (3d Cir. 1994).  Those decisions, however, are entirely consistent with Fuentes.  See Seman, 26 F.3d at 433 (noting that, under

At summary judgment, the district court found that Waldron had established a prima facie case, and Waber does not contest that issue on appeal. However, the district court credited Waber with having established the following non-discriminatory business justification for its decision to terminate Waldron. Because of economic hardship, Waber was forced to restructure its industrial marketing business, and one of the changes involved reverting to the organizational structure it had formerly used. That is, Waber decided to re-bifurcate the two segments of the industrial market -- electrical and electronics -- with each segment having its own manager. However, Waber decided that Waldron was not the best candidate for either of the two positions. Having had the chance to assess Waldron's performance as industrial market manager for more than a year, the company determined that he was not the best candidate for either new position primarily because Waldron had not sufficiently visited "key accounts." The company's conclusion was confirmed when it was preparing its fiscal 1992 business plan. Waldron's portion of the business plan was considered

(..continued)
Hicks, "rejection of the employer's proffered nondiscriminatory reason will permit the trier of fact to infer the ultimate fact of intentional discrimination, so long as there is a finding of discrimination. In other words, `[t]he factfinder's disbelief of the reasons put forward by the [employer] . . . may, together with the elements of the [employee's] prima facie case, suffice to show intentional discrimination.'"); Armbruster, 32 F.3d at 783 (recognizing that disbelief in the employer's proffered explanations, combined with the plaintiff's prima facie case, may be sufficient to allow a jury to infer the "ultimate fact of intentional discrimination").

inadequate and needed a "massive overhaul," and when called upon at a meeting to rehearse his part of the presentation, he was unprepared. Furthermore, at the conclusion of the presentation to the management of Waber's parent, SL Industries, Waldron made comments about increasing sales by increasing sales reps' commissions that showed that he either did not know -- or did not agree with -- the direction Waber was pursuing, since Waber's plan was to increase sales by pursuing "key accounts" -- very large current or potential customers. Waldron, 849 F. Supp. at 1002.

In reply, Waldron contends that he established both that Waber's putative justifications were false and that age-related bias in fact motivated the decision to fire him. We evaluate Waldron's responses to Waber's explanation below. As we do, we recall that since this case is before us for review of a grant of summary judgment, we address the case as if we were the district court, exercising plenary review of both facts and law. Additionally, we must view the evidence in the light most favorable to the nonmovant, giving that party the benefit of all reasonable inferences derived from the evidence. Torre v. Casio, 42 F.3d 825, 830 (3d Cir. 1994).[6]

_____

[6]. Waber argued to the district court that it should apply the Fourth Circuit's reasoning in Proud v. Stone, 945 F.2d 796 (4th Cir. 1991), that because Waldron was 61 years old when hired by Waber and 63 1/2 years old when promoted prior to termination, a strong inference existed that discrimination was not a determining factor for the adverse action taken by the employer. Although the district court did not rely on Proud, it did "accept the logic that underlies the Proud inference." Waldron, 849 F. Supp. at 1006 n.14.

1.

Addressing first the company's reorganization plan, Waldron contends that the evidence at summary judgment would permit a jury to reasonably conclude that the reorganization was simply a way of getting rid of him in favor of a younger employee, Ed Brown (age 32).  Waldron does not dispute that the company was experiencing economic difficulties during the period leading up to his dismissal.  However, Waldron argues that the evidence of Waber's post-termination conduct belies the company's contention that a valid reorganization precipitated Waldron's termination.

Waldron begins by explaining that the evidence, viewed in his favor, shows that Waber split the industrial market manager position into two segments and named Brown to the post of electronics marketing manager, but it left the other position open and within one-half year of Waldron's termination, Waber recombined the two market segments under one title -- industrial market manager -- with Ed Brown in that position.  Waber responds

(..continued)
However, we agree with the position advanced by the Equal Employment Opportunity Commission as amicus curiae:  "where, as in Proud, the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination.  But this is simply evidence like any other and should not be accorded any presumptive value."  EEOC Br. 22. Additionally, as the EEOC further notes, it was plausible under the evidence presented at summary judgment that Waber would hire Waldron, use his skills for a few years while a younger person was being "groomed" for his position, then fire Waldron because of his age.  Id. at 22-23.  Thus, even if we were inclined to apply Proud in some circumstances, this case would be an inappropriate candidate for the presumption.

that Waldron's "facts and surmises" simply show that the company ultimately decided to adopt a "different organizational structure which was less expensive than the one it planned to implement at the time it decided to let him go –– and, as a result of this further restructuring, Mr. Waldron's former title was ultimately given to Ed Brown –– a younger employee (albeit one with many more years of continuous service with Waber)." Appellees' Br. 27–28. But Waber does not provide any evidence in support of its contention that subsequent to Waldron's discharge the company adopted a new plan of reorganization. More significantly, however, Waber's response ignores the inference created by evidence demonstrating that Waber split Waldron's job, fired him, offered one-half of his former job to a younger person while the other half remained unadvertised, and then recombined the jobs and placed the younger employee in the recombined post. Although Waber may be able to explain this behavior at trial, a reasonable jury certainly could conclude that these actions cast sufficient doubt on the company's contention that Waldron was discharged as part of a plan of reorganization.[7]

Waldron also notes with respect to the reorganization that Waber's business plan for fiscal year 1992, which was worked

[7]. Waber conceded at oral argument that there was "no dispute" that Waber "vacillated" in the course of eighteen months, asserting that it went back and forth five times in splitting and recombining the Industrial Market Manager position during the period leading up to and immediately following Waldron's termination. The company also explained that Waldron himself was the beneficiary of many of the vacillations. That would not excuse, however, the use of a putative reorganization as a ruse to shunt Waldron out the door.

on by both Woznicki and Mazik and presented to Waber's parent company just one month prior to Waldron's termination, did not show the industrial market manager position being split up into segments.  App. 233-34 (Mazik deposition).  Waber responds that the fact that the recently adopted business plan had Waldron's name in the industrial market manager spot is consistent with its explanation that it decided not to keep Waldron on in the reorganization.  This shows, the company contends, that the decision to fire him did not come until his poor performance in preparing and rehearsing the fiscal 1992 business plan in July.  Yet Waldron's evidence suggests that the company did not intend to have two positions -- or at least not for long.  The permissible inference is that the reorganization was not planned, but rather pretextual.

Additionally, Waldron contends that there is evidence upon which the jury could conclude that the reorganization that cost Waldron his job demonstrated age-related prejudice by Waber.  Waldron notes that when his predecessor at the industrial market manager position, Scott Hammill (twelve years his junior), had difficulties, Waber had found him help by splitting his position and giving him one half of the industrial market.  By contrast, Waldron notes, when Waber determined to split up Waldron's job (the same post Hammill had held), Waldron was not offered either segment of the industrial market, but instead was terminated.

Surprisingly, Waber did not respond to this last argument in its briefing.  Perhaps by way of partial response, however, Waber asserts the uncontroversial proposition that

"barring an attempt to conceal discrimination," a company "`has the right to make business judgments on employee status, particularly when the decision involves subjective factors . . . that the [c]ompany deems essential' to the position" in question. Appellees' Br. 28, quoting Healy v. New York Life Insurance Co., 860 F.2d 1209, 1220 (3d Cir. 1988).  That argument begs the question, however, of whether the reorganization was an attempt to conceal discrimination.

Viewing all of the evidence in the light most favorable to Waldron and weighing the parties' arguments, we agree with Waldron that the evidence presented at summary judgment would permit a reasonable jury to conclude that Waber's reorganization was not the reason for Waldron's termination, but rather a pretext.  The vacillations at Waber over whether to have a single industrial market manager or separate electrical and electronics managers may have been innocent, but under the evidence presented at summary judgment, a jury could reasonably question whether the "reorganization" that ostensibly precipitated Waldron's termination was in fact just a way of removing Waldron replacing him in the industrial market manager position with the younger Ed Brown.  Additionally, Waldron's evidence concerning the business plan is not without force:  a jury could reasonably conclude that Waber's failure to account for a split in the industrial market manager position in its carefully orchestrated business plan demonstrates that the reorganization came about because of Waber's desire to terminate Waldron's employment, rather than as a factor innocently leading to that result.  Thus, there is

sufficient evidence upon which a jury could reasonably determine that Waber's justification for terminating Waldron because of a reorganization was implausible and inconsistent.

2.

We turn, therefore, to Waber's contention that its dissatisfaction with the way in which Waldron pursued key accounts during his tenure as industrial market manager was part of the reason why the company terminated Waldron in the reorganization.  According to Waber, it grew frustrated by Waldron's alleged unwillingness or inability to pursue key accounts through face-to-face meetings at the headquarters of such customers and potential customers.  Waldron, however, contends that he submitted substantial evidence at summary judgment upon which a jury could reasonably determine that Waber's justification was either a post hoc fabrication or actual evidence of discrimination.  Again, we agree.

Initially, Waldron disputes whether in fact he failed to visit key accounts.  The district court quoted from and relied upon the testimony of Mazik, in which he stated that Waldron "`couldn't or wouldn't visit major accounts in the electrical distribution market . . . .'"  Waldron, 849 F. Supp. at 1002 (quoting Mazik Dep.).  Waldron testified, however, that he visited key accounts, and also testified that his requests for authorization to travel were sometimes rejected by Woznicki. App. 62-64, 66, 162 (visited accounts), 127, 153-57 (Woznicki rejected travel requests).

The district court did not address any of this testimony at summary judgment -- to the contrary, it stated that Waldron had "concede[d] that he disregarded the company policy of calling on key accounts . . . ." Waldron, 849 F. Supp. at 1005. As support, the district court cited a portion of Waldron's deposition that, in our view, simply does not support the theory that Waldron "conceded" anything. See id. (citing Waldron Dep. at 439); cf. App. at 158-59 (showing context of material quoted by district court), 162 (Waldron testifies that in year preceding termination he made between 12 and 14 key account visits to company headquarters in electrical market and between 4 and 5 in electronics market).

Nevertheless, this evidence is not ultimately probative of pretext. Waber submitted testimony suggesting that the company was dissatisfied with Waldron's efforts at contacting key accounts in face-to-face meetings at their business locations. E.g., App. 207, 211, 239. Thus, the fact that Waldron indeed made key account visits is not probative of whether Waber believed that he should be doing more in that effort. See Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) (plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker"). Of course, to the extent that Waldron's testimony tended to show that his supervisor hampered his efforts to make more key account visits, that evidence could lead to an inference that Waber intentionally set goals that Waldron could not meet. Yet Waldron's deposition testimony on this point was equivocal. When pressed by opposing

counsel, Waldron stated that he had "no idea" where he had wanted to go on the three or four occasions on which he sought but was refused authorization to travel. App. 154. Thus, crediting Waldron's evidence that he was denied such authorization, that still does not prove that the contemplated travel was for face-to-face meetings with key accounts, as the company wanted.

Waldron's second thrust at the key account justification, however, is more powerful. Waldron notes that despite Waber's contention that focusing on key accounts was an "edict of the company, especially under Ron Mazik's tenure, and even prior to that" (App. 208 (Woznicki Dep.)), or alternatively the "major focus, and that wasn't just for Reed Waldron" (App. 212), Waber replaced Waldron with Ed Brown, an employee who had performed only as a "back-up" to sales representatives and who did not have any significant experience making calls to key accounts. App. 191, 242-43. Additionally, according to Mazik, Waber did not expect Brown to make key account calls after replacing Waldron -- Mazik stated that "[w]e didn't think that Ed Brown had the capabilities to do that." App. 243. And, according to Mazik, in fact "nobody" performed the job of calling on key accounts after Waldron's departure. Id.

This evidence points in one of two probative directions. On one hand, as Waldron argues, the evidence could lead a reasonable jury to reject Waber's explanation that the company fired Waldron because he failed to call sufficiently on key accounts. Given the evidence that despite Waber's ostensible focus on key accounts, the company elevated (in an admittedly

roundabout way, see supra pp. 12-14) to industrial market manager an employee with no sales experience (whom it considered incapable of calling on key accounts), and that no one called upon key accounts after Waldron was fired, a jury could reasonably conclude that visiting key accounts was not nearly as important to Waber as it said it was -- and that Waber's explanation for firing Waldron was thus unworthy of credence.

Alternatively, as Waldron also argues, one could view the evidence on key accounts as suggestive of a double standard. For Waldron, the evidence suggests, visiting key accounts was an element of the industrial market manager position. For Brown, it was not.

Waber responds in two ways to Waldron's arguments. First, it asserts that the evidence, taken as true, would only support the inference that by the time Brown assumed the title of industrial market manager, that position had become a job lower on the organizational ladder with fewer responsibilities, and visiting key accounts was no longer among them. Appellees' Br. 30. However, Waber provides no citation to the record to support the suggestion that Brown's job was lower on the organizational ladder, and we find both of the inferences suggested by Waldron -- that is, pretext or double standard -- to be at least equally as plausible as the one offered by Waber.

Second, Waber argues that Waldron's double-standard argument runs afoul of Fowle v. C & C Coal, a Div. of ITT-Continental Baking Co., 868 F.2d 59 (3d Cir. 1989). In Fowle, the plaintiff alleged that he had not been hired as a company

vice president because of his age. The company responded that Fowle did not satisfy one of the essential criteria of the job -- that is, he lacked the management skills necessary to possibly replace the president of the company within two to four years. Id. at 64. Fowle attempted to show that this justification was pretextual by demonstrating that this ostensible prerequisite was subsequently relaxed (from two to four years to five to ten years) as soon as the company found a candidate younger than Fowle that it wanted to hire. We rejected Fowle's argument, finding that Fowle's evidence suggested, at most, "an evolution of the position's specifications" over time. Id. at 66. Waber apparently believes that, in a similar manner, Waldron's evidence with respect to key account visits merely demonstrates that the industrial market manager position evolved over time, but creates no inference of pretext or discriminatory double standard.

Yet Fowle cannot be read so broadly. If, every time one candidate for a position was rejected based on some criterion and another was ultimately hired notwithstanding his or her failure to satisfy the same criterion we nevertheless permitted employers to escape liability with the explanation that the job specifications had simply changed, we would rip a great hole in the Congressional scheme for affording relief for the victims of discrimination. Indeed, Fowle itself makes this fact clear in a manner that distinguishes it from this case. We noted that, even though the precise contours of the job requirement at issue there may have changed over time, there was "no evidence that potential to replace the President -- in whatever time frame -- was not a

requirement" of the successful candidate. Fowle, 868 F.2d at 66. By contrast, in the case before us, Waldron's evidence suggests that although visiting key accounts was a job requirement when he held the industrial market manager position, it promptly ceased to be one when he left. Thus Fowle does not insulate Waber in this case.

The district court rejected Waldron's double-standard evidence based upon a different theory. The district court found that whereas the typical double-standard case involves objective criteria, this case involved subjective criteria. Waldron, 849 F. Supp. at 1007. Because the employment decision in this case involved subjective criteria, the district court reasoned, our decision in Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992), prohibited the court -- or a jury -- from intruding into and second-guessing Waber's business decision.

We disagree with this analysis on several grounds. First, we disagree with the district court's apparent premise that visiting key accounts was a "subjective" job criterion. The evidence at summary judgment indicated that it was an objective and readily assessable criterion. Furthermore, Ezold does not stand for the proposition that it is always impermissible to review employers' subjective decision making -- indeed, quite to the contrary, Ezold contemplates that courts and juries must do so.

In Ezold, a female associate had been denied partnership at a law firm because the firm had decided that she

was deficient in legal analysis skills. She sued, alleging sex discrimination, and the district court agreed and found the firm liable. We reversed. We cautioned in the course of our opinion against "interfer[ing] in an otherwise valid management decision" without some evidence to "cast doubt" on the employer's proffered reasons. Ezold, 983 F.2d at 527. We focused, however, upon the district court's failure to stick to the criterion at issue in the employer's business justification. We found that instead of determining whether the criterion of "legal analysis skills" had been applied in a discriminatory manner -- i.e., whether male associates had been welcomed into the partnership notwithstanding the firm's belief that they lacked legal analysis skills -- the district court had impermissibly determined that the plaintiff's other strengths outweighed any deficiencies in legal analysis. Id. at 527-28. Thus, in disapproving the district court's analysis, we did not conclude that it would be impermissible for the district court to determine whether the criterion of "legal analysis skills" -- a standard with undeniably subjective elements -- had been applied differentially. Rather, we stated:

> Where an employer produces evidence that the plaintiff was not promoted because of its view that the plaintiff lacked a particular qualification the employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether non-members of the protected class were treated more favorably.

Ezold, 983 F.2d at 528. Therefore, Ezold does not stand for the proposition that courts and juries are foreclosed from assessing

whether an employer created a double standard using one or more subjective criteria, but instead stands for the opposite principle.

Thus, it is evident that Waldron also cast substantial doubt upon Waber's proffered justification that it decided to terminate Waldron because of his failure to visit key accounts with sufficient regularity. Indeed, viewed in the light most favorable to him, Waldron's evidence suggests either that failure to visit key accounts with regularity was not really a reason for Waldron's termination (that is, the reason is pretextual) or that Ed Brown was treated more favorably than Waldron, suggesting not just pretext, but in fact discriminatory bias.

3.

As we have seen, Waber contended that economic hardship forced a restructuring of the industrial market manager position, and that the decision not to retain Waldron for either of the two positions was motivated largely by the fact that Waldron had failed to visit key accounts with sufficient regularity. Appellees' Br. 8-9. The company contends, however, that the decision to terminate Waldron "became inescapable during June 1991 as Waber was preparing to present its business plan" for fiscal year 1992. Id. at 9. Waber contends that Waldron showed his weaknesses as an employee at this point in three areas: (a) drafting his portion of the business plan in an inadequate manner that required substantial rewriting by his supervisors; (b) failing to perform adequately at a dress rehearsal of the presentation of the business plan to corporate officers of

Waber's parent; and (c) making stray comments at the actual presentation of the business plan that suggested that Waldron was either unaware of or disagreed with the direction in which the company was headed.

Initially, we note that none of these factors was presented to the district court or argued to us as an independent justification for Waber's decision to terminate Waldron. Rather, each was ostensibly a proverbial straw which, taken together, broke a back weakened by Waber's need to reorganize and Waldron's failure to serve key accounts in the manner desired by his superiors. Having produced evidence upon which a jury could reasonably conclude that both the reorganization and key account justifications were pretextual (and in the latter case possibly evidence of bias), Waldron thus has also undermined the vitality of the other proffered justifications that we turn to now. However, since Waldron does not rest merely upon his refutation of Waber's principal business justifications for the termination of his employment, but rather provides particularized responses to these "final straw" justifications, we address his evidence and arguments below.

(a)

At summary judgment in the district court, Waber relied upon the deposition testimony of Woznicki to support its contention that Waber was discouraged by Waldron's draft of his portion of the business plan for fiscal year 1992, which required a "massive overhaul" by Woznicki and Mazik to get it in shape to present to Waber's parent company. See Waldron, 849 F. Supp. at

1002; see also App. 216.  This dissatisfaction, Waber contended, helped to tilt the balance against retaining Waldron.

Waldron responds that he presented evidence by way of his own testimony that no changes were made his portion of the business plan.  App. 173.  Waber criticizes Waldron's testimony as "self-serving," but the Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(noting that plaintiff may create material issue of fact by proffering, inter alia, "her own affidavits").  Furthermore, it is obvious that the testimony is no more self-serving than Woznicki's was on behalf of Waber.  Waldron's testimony was under oath and subject to cross examination, just as was Woznicki's.  Since no other evidence was presented aside from the two deponents' competing recollections, we see little reason to credit one and reject the other.  Instead, we see this as a disputed material fact issue to be resolved at trial.

Waber also states that the issue was not whether Waldron believed that he wrote his portion of the business plan adequately, but rather whether Woznicki and Mazik were satisfied with it.  Yet Waldron's testimony, if believed, establishes that Woznicki and Mazik did not rewrite the business plan, which casts serious doubt on Waber's contention that it was dissatisfied with Waldron's efforts.

(b)

With respect to the so-called "dress rehearsal" of Waber's fiscal 1992 business plan, Waldron concedes that he

performed poorly -- "I . . . came off as being unprepared, which I was." App. 175. Waldron maintained at summary judgment, however, that evidence demonstrated that he was "tripped up" by Mazik and "singled out" at the meeting -- which he had not been told was a dress rehearsal -- as the only one forced to make his presentation. App. 173-75.[8] Again, Waber contends that this evidence was "self-serving" deposition testimony, but we see no reason for not finding that it, too, creates a disputed issue of material fact.

(c)

Finally, Waber, using the testimony of Woznicki, argued that Woznicki and Mazik also were dissatisfied with Waldron's performance at the actual presentation of the fiscal 1992 business plan to Waber's parent company, SL Industries. Specifically, Woznicki stated that, after completing his presentation, Waldron mentioned that the way to expand Waber's business was "through [sales] rep[resentative] commission

---

[8]. At oral argument, Waldron made an additional argument not present in his briefs: to the extent that the meeting at which he was forced to make his impromptu presentation was a dress rehearsal, a jury could reasonably infer that Waber's reaction to Waldron's mistakes were stereotypical. That is, dress rehearsals are meant to shake out the bugs and allow people to make mistakes, but Waber reacted in a manner that suggested that it believed that when an older employee makes a mistake, he cannot learn. Waldron's counsel might be able to make this argument to the jury, of course, but we refuse to rely upon it because it is premised on the theory that mistakes are expected at dress rehearsals and were tolerated when made by employees other than Waldron at the rehearsal in question, assuming that the meeting was in fact a dress rehearsal. Based on the record before us, that is speculation, not evidence.

increases." App. 217 (Woznicki Dep.). This comment, Woznicki stated, made him and Mazik look bad because that was not what the company planned to do. Id. The comment was especially damaging because this was Mazik's first presentation to Waber's parent company, and he had wanted everything to go flawlessly. Id.

Waldron responded at summary judgment, however, by pointing to his deposition testimony, in which, apparently reading from the business plan itself, he noted that "[r]evamping [sales representatives'] commissions to reward growth" was in the plan. App. 177. Waldron also notes that in the same memorandum to industrial sales representatives in which Woznicki announced Waldron's termination, Woznicki also announced an increase in sales representatives' commissions as a promotional effort (App. 192), suggesting that increasing commissions was not inconsistent with Waber's growth strategy. This evidence could permit a jury to conclude that it was implausible that Woznicki and Mazik felt that Waldron's comments at the formal presentation concerning increased commissions showed that he was unaware of or in disagreement with the company's focus.

4.

Finally, we note Waldron's additional argument that he has evidence of age-related animus or bias in the form of a comment made to him by Mazik. Waldron testified that five months prior to his termination, in a meeting in which Mazik promoted Waldron to industrial market manager, Mazik told him, "I want you to lose weight. He told me that it'll make you feel better. It'll make you look younger." App. 129. The district court

found that "Mazik's comment that plaintiff might consider losing weight in no way indicates that plaintiff's termination was motivated by age." Waldron, 849 F. Supp. at 1008. Noting that the comment was five-months prior to Waldron's termination and in the context of a promotion, and also Waldron's concession that Mazik did not condition continued employment upon satisfying Mazik's desires, the court concluded that "we believe the comment to be a stray remark entitled to little if any weight . . . ." Id., citing Ezold, 983 F.2d at 545.

We disagree. Crediting the evidence, the comment was made by the person who, according to Waber itself (Appellees' Br. 6), ultimately approved the decision to terminate Waldron. Furthermore, although the comment was made five months prior to Waldron's termination, it occurred at a time when, according to Mazik himself, Woznicki was already arguing to him that Waldron's employment should be terminated. App. 236.[9] Thus, we believe that the comment may be entitled to some weight when considered by the jury, although standing on its own it would likely be insufficient to demonstrate age-related animus. In other words, the comment is not irrelevant, especially when coupled with Waldron's other evidence of discrimination, which demonstrates a double standard was applied vis-a-vis Brown as to visiting "key

_____

[9]. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992), is distinguishable on both grounds mentioned in the text: the discriminatory comment in that case was made by a non-decisionmaker, five years prior to the decision to refuse the plaintiff in that case admission into the law firm partnership. Ezold, 983 F.2d at 545.

accounts."  A reasonable jury could conclude that this evidence of discrimination, coupled with Waldron's prima facie case, proved that age discrimination was more likely than not a determinative factor in Waber's decision to terminate Waldron's employment.

## C.

To summarize, Waldron provided sufficient evidence upon which a reasonable jury could determine that Waber's proffered justifications for its decision to terminate Waldron's employment were unworthy of credence.  Waldron has cast doubt upon Waber's contention that the need for a business reorganization precipitated Waldron's firing, and he also has produced evidence upon which the jury could conclude that Waldron was not let go because of dissatisfaction about his alleged failure to visit key accounts with sufficient regularity.  Indeed, a jury could permissibly infer from Waldron's evidence concerning key accounts that Waber applied a double standard with respect to Waldron and the much younger Ed Brown.  By undercutting these principal justifications for terminating Waldron's employment, Waldron has also provided reasonable grounds upon which a jury could reject as weak and implausible Waber's three ostensible "final straws" -- Waldron's alleged poor draftsmanship on a portion of the business plan, his poor performance at a putative dress rehearsal of a presentation of that plan, and the dissonance ostensibly caused by Waldron's offhand comments after formal presentation of the plan.  Additionally, however, as we have just discussed, Waldron has produced particularized evidence upon which a jury

could reasonably conclude that each of these ostensible last straws is unworthy of credence.

Furthermore, this record is not without evidence which tends to support not just pretext, but pretext for discrimination. As we discussed at greater length above, a jury could reasonably infer that Waldron's evidence with respect to key accounts demonstrated that Waber imposed a double standard. Mazik's comment that he wanted Waldron to lose weight because it would make him look younger takes on a more suspicious cast when coupled with evidence that Woznicki was already pushing Mazik to fire Waldron when the comment was made. If a jury then reflected that Waldron was not kept on when the industrial market manager position was split in two because he failed to visit key accounts, but that young Ed Brown was elevated ultimately to a reconstituted industrial market manager position without having to call upon key accounts, the jury might reasonably infer that Brown's youth excused his inability to service the key accounts. Thus, even if we were permitted to ignore Fuentes and its progeny and apply a "pretext-plus" standard, we nevertheless would conclude that Waldron satisfied that standard, as well.

Because Waldron produced sufficient evidence to survive summary judgment on his ADEA claim, we will reverse the district court's judgment in favor of Waber on that claim.

### III.

The district court granted summary judgment not only on Waldron's ADEA claim, however, but also on his claim under the New Jersey Law Against Discrimination, reasoning that the LAD and

ADEA "are governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq." Waldron, 849 F. Supp. at 1000, citing Erickson v. Marsh & McLennan Co., 117 N.J. 539, 569 A.2d 793 (1990), and Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 538 A.2d 794 (1988). Thus, we must assess whether summary judgment in the LAD claim must be reversed as well.

Since the district court's opinion in this case, we have predicted in McKenna v. Pacific Rail Services, Inc., 32 F.3d 820 (3d Cir. 1994), that the New Jersey Supreme Court would adopt Hicks's "clarification of the test to be applied in federal discrimination cases in interpreting the LAD . . . ." Id. at 824. This is consistent with the district court's hypothesis about the similarities between federal and New Jersey law relating to age discrimination. McKenna, however, involved a jury trial under the LAD, and we reversed because the district court had not provided jury instructions consonant with Hicks. It did not involve the standard for summary judgment under the LAD, and the parties here did not brief the issue of whether the New Jersey Supreme Court would adopt Fuentes, just as we predicted in McKenna that it would adopt Hicks.

Largely for reasons discussed in McKenna, we believe that the New Jersey Supreme Court would adopt our reasoning in Fuentes as governing what evidence must be produced by a plaintiff to survive summary judgment in an indirect evidence case after Hicks. As we noted in McKenna, the New Jersey Supreme Court has not only adopted the McDonnell Douglas framework for

evaluating discrimination cases based upon indirect evidence, but has consistently looked to federal courts for guidance about the application of the shifting-burdens analysis. McKenna, 32 F.3d at 827. Where the New Jersey Supreme Court has departed from federal precedent, it has often done so in order to lessen the burdens on plaintiffs. Id. at 827-28. And indeed, consistent with Fuentes, we stated in McKenna that a plaintiff's proof of a prima facie case and rebuttal of an employer's justifications "may suffice [to carry a plaintiff's ultimate burden of persuasion] if the factfinder believes that the employer offered false reasons to conceal unlawful discrimination. . . ." Id. at 831.[10] These considerations lead us to conclude that the New Jersey Supreme Court would adopt the more liberal "pretext-only" standard enunciated in Fuentes for determining a plaintiff's burden at summary judgment, rather than the more demanding "pretext-plus" standard adopted by some of our sister circuits.

Thus, what we said about Waldron's ADEA claims also applies here, and for the reasons provided in Section II, supra,

_____

[10]. Of course, in McKenna we predicted that the New Jersey Supreme Court would adopt Hicks, instead of some more lenient rule, because of the following: (1) in New Jersey, as in federal law, plaintiffs always retain the ultimate burden of persuasion with respect to claims of discrimination (McKenna v. Pacific Rail Service, 32 F.3d 820, 828 (3d Cir. 1994)); (2) New Jersey and federal rules relating to presumptions are similar (id. at 829-30); and (3) the New Jersey Supreme Court's decision in Goodman v. London Metals Exch., Inc., 86 N.J. 19, 429 A.2d 341 (1981), was consistent with the Hicks formulation of a plaintiff's burden at trial (McKenna, 32 F.3d at 830-31). Those factors in no way suggest that the New Jersey Supreme Court would refuse to adopt Fuentes.

we find that Waldron's LAD claims should have survived summary judgment, as well.

IV.

In conclusion, we find that Waldron proffered sufficient evidence to survive summary judgment on his ADEA claims under <u>Fuentes</u>.  We also predict that the New Jersey Supreme Court would adopt <u>Fuentes</u> as a proper articulation of a plaintiff's burden at summary judgment for claims under the LAD.  Thus, we will reverse the district court's judgment in its

entirety and remand this case for further proceedings consistent with this opinion.