

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-2007

# Constant v. Mellon Fin Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3439

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Constant v. Mellon Fin Corp" (2007). *2007 Decisions*. Paper 460.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/460

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3439
_____

SUSAN CONSTANT,

Appellant

v.

MELLON FINANCIAL CORPORATION
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 03-cv-01706)
District Judge:  Honorable Terrence F. McVerry
_____

Submitted Under Third Circuit LAR 34.1(a)
May 18, 2007

Before:  FISHER and ROTH, *Circuit Judges*, and RAMBO,[*] *District Judge*.

Filed: September 7, 2007
_____

OPINION OF THE COURT
_____

_____

[*]The Honorable Sylvia H. Rambo, United States District Judge for the Middle
District of Pennsylvania, sitting by designation.

RAMBO, *District Judge*.

This case arises from the termination of Appellant Susan Constant from her

employment at Appellee Mellon Financial Corporation ("Mellon"). Constant alleges that

she was fired in retaliation for requesting leave under the Family Medical Leave Act.

Mellon contends that she was fired for poor job performance. Specifically, Mellon cites

her poor writing, poor business judgment and communication with her supervisor during

contract negotiations, and unprofessional demeanor. Because Constant has not shown

that Mellon's reason for terminating her employment was pretextual, summary judgment

was properly granted in the District Court and we will affirm.

I.

The following facts are undisputed, except where noted. Constant was employed

from February 2002 through June 2003 as a Marketing Specialist III in Mellon's

Corporate Marketing Department; as such, her primary job was writing. Peter Hayes was

her direct supervisor as the Director of Marketing. He, in turn, reported to Rose Cotton, a

Senior Vice President and Director of Corporate Affairs.

In late May 2002, there was a domestic disturbance at Constant's home. She was

charged with various crimes as a result. She used four days of vacation time immediately

after the incident. Between June and September 2002, Constant left Mellon during work

hours on a number of occasions for reasons related to the criminal charges. At work,

Hayes advised her to keep a professional demeanor while in the office and to keep her

personal issues separate from her work. She made personal phone calls from work

regarding her legal situation. The volume, frequency, and nature of the phone calls were bothersome to Constant's coworkers. After repeated warnings, Hayes took disciplinary action against her on November 4, 2002, by placing her on the first stage of Mellon's corrective action process because of her "disruptive and inappropriate behavior in the workplace." (R. at 190.) On December 13, 2002, however, she made another disruptive call.

Constant's year-end performance review occurred on January 31, 2003. On a majority of the evaluation criteria, Constant met or exceeded expectations. Hayes noted, however, that Constant's work was "sometimes marred by haste and a lack of attention to detail" and suggested that she improve editing and proofreading skills. (R. at 195.) Constant wrote that she need to "improve attention to detail" when writing and editing her own work. As far as the content of her writing, Constant conceded that she was not as familiar with Mellon's prescribed style of writing, "which tend[s] to make my writing not as sharp as it could be on first draft and make projects take longer because I need more time to learn the right contacts, etc." (R. at 201.) Additionally, Hayes observed that Constant had "struggled to keep some very difficult personal circumstances out of the workplace, as professionals are required to do. However Susan has show [*sic*] improvement in this area and there are signs that this issue will pass in time." (R. at 195.)

During her employment at Mellon, Constant's assigned projects included compiling a database comparing Mellon to its competitors, creating five brochures advertising Mellon's services, and creating a newsletter called *CFIdeas*. Hayes found

3

typos in the database including mistakes in spelling and business line attribution. With respect to the brochures, he testified that Constant changed the standard boilerplate language describing Mellon which should be the same in all of the brochures. Some mistakes that he changed reappeared in her later drafts. He ended up writing one brochure, in conjunction with another Mellon employee, because Constant "couldn't get to a resolution" with the managers of one line of business within Mellon regarding a description of its services. (Hayes Dep. 29:14-30:5, May 11, 2004.) Additionally, one of the brochures had to be reprinted because Constant identified a Mellon study as the "Bank Le*n*der Study" rather than its accurate name of the "Bank Le*a*der Study." Constant maintains that Hayes praised her for her work on these brochures, pointing to comments he made in her performance evaluation on January 31, 2003. She admits to the Lender/Leader typographical error, but argues that an entire team of Mellon employees reviewed the content of the brochure before it was sent to print.

Constant also had primary responsibility for the content and production of *CFIdeas*, a newsletter published to Mellon employees. Rose Cotton initiated publication of the newsletter in May 2003. The goal of *CFIdeas* was to keep the leadership priorities of Mellon's Customer Focus Initiative in the forefront of the minds of Mellon employees. It was to reinforce the principles for employees who had learned the CFI concept years before and to indoctrinate new employees who were unfamiliar with it. To emphasize continuity, Cotton instructed Constant to use old CFI materials and replicate the language and style of the writing used therein. *CFIdeas* was slated to be published on a monthly

4

basis beginning in May 2003, attached to an email "wrapper" that provided an overview of the contents of the newsletter. Constant began drafting *CFIdeas* in April 2003.

Upon review of the initial drafts, Cotton requested a meeting with Constant and Hayes because Constant was not using the specific language from the prior CFI materials as Cotton had instructed. Constant's later drafts of the May newsletter did not meet Cotton's articulated goals, but was published in May 2003 because Cotton had committed to launch the newsletter that month. Cotton claims that Constant's poor work performance was discussed as a serious issue among management during the drafting process for this issue of *CFIdeas*. Constant maintains that Cotton did not express concerns about the content of her writing and made only minor edits to the email wrapper under which the May *CFIdeas* would be published.

Constant was part of a team of Mellon employees who negotiated a contract with SkillSoft, a vender of online training programs. Hayes testified that he and Constant agreed that SkillSoft was not the optimal vendor for their needs. He sent Constant into the negotiation with the expectation that the contract would not be renewed, at least as it affected the Corporate Marketing Department. He claims that Constant did not mention the contract until Friday, April 18, 2003, months after the negotiations had begun. On that date, she sent him an email requesting a meeting with him early the following week to discuss the contract, which was attached. Hayes did not read the contract or reply to Constant because the cover email did not call his attention to specific issues of concern. He did not know that the contract would be signed on April 30, 2003. He did not know

5

that Constant had negotiated for a three-year contract term with a concomitant price reduction, with the agreement of the other Mellon negotiators.

On April 29, 2003, Constant sent Hayes a second email regarding the SkillSoft contract. This email contained "highlights" of the contract as it affected the marketing department. It noted the three-year commitment. Hayes objected to the three-year term, but learned that if he withdrew his department from the deal, the whole contract would fall through. Hayes felt that Constant did not keep him informed of the progress of the negotiations and thus effectively committed the Corporate Marketing Department to a contract that he felt was not in its best interest. Constant contends that she provided updated information to Hayes on a number of occasions in the preceding February and March, including the term of the contract and the cost savings that would accrue to Mellon as a result, and Hayes did not object.

During the time that the negotiations with SkillSoft were coming to a close and Constant was beginning to prepare the drafts of the May *CFIdeas*, Constant's husband was in a severe car accident. On April 25, 2003, Constant asked Hayes to submit her official request for FMLA leave. She wanted to take her leave in half-day increments on the days when her husband had medical appointments. Constant claims that Hayes told her that she had to take leave in contiguous, full days. Constant and Hayes then spoke on April 28, 2003. She made the same request and he had the same response, but Constant alleges he became angry about her request on this date. Hayes testified that, although he

initially misunderstood the nature of Constant's requested leave, he had no objection to her taking half-days once it became clear to him.

As of April 30, Constant maintains, Hayes' previously professional and friendly demeanor towards her became cold and hostile. He continued to insist that half-days of leave were not permitted but timely filed her FMLA leave request with human resources. Her request was approved for leave in twenty half-day increments from May 27, 2003 through mid-August of that year.[1] Per Constant, Hayes's criticism of her work dramatically increased after she requested FMLA leave in half-day increments.

On June 2, 2003, Hayes issued Constant a memorandum entitled "Corrective Action/Final Warning." Its purpose was to notify Constant that she was "being placed on the final stage of corrective action due to chronic and repeated failure to meet the work requirements of [her] job." (R. at 202.) It refers to the behavioral problem leading to the previously-issued corrective action memorandum. The reasons for the June memorandum are 1) Constant's "inability to meet the requirements of the communicator's position;" 2) poor communication and failure to inform management of key aspects of a project; and 3) "poor business judgment" for agreeing to a three-year contract with SkillSoft. (*Id.*) It warns Constant that "additional steps [would] be taken, up to and including termination of [her] employment at Mellon" if her performance did not show "immediate and sustained improvement." (R. at 203.)

_____

[1]Ultimately, it appears that Constant took FMLA leave on only six days during May and June.

Constant met with Hayes to discuss the final warning memorandum soon after it was issued. She asked why he had not mentioned problems with her work before issuing the final warning; he replied that she should have known. She further claims that, during this meeting on June 4, 2003, he stated that the memorandum was not a result of her request for FMLA leave, but that the way in which she asked to take the leave was an "odd use" of such leave.

According to Cotton, problems with Constant's writing continued in her drafts of the June 2003 *CFIdeas* and its wrapper. Again, Cotton met with Hayes and Constant to express her dissatisfaction that Constant was not using the prescribed language for CFI. Cotton directed her to return to the original CFI materials provided and use the exact same language used therein. Constant claims that Cotton reviewed the copy of this edition of *CFIdeas* and made minor changes without comment on the underlying substance of her writing. Further, she submits that she did, in fact, use language lifted from some prior CFI materials.

Because she was not satisfied with Constant's work, Cotton brought in another Mellon employee, Shawn Bannon, to serve as a technical writing expert and to conform the newsletter's style to Mellon standards. Bannon testified that Constant's work did not adhere to Mellon style standards and that he did not regard the quality of her writing as good.

During June 2003, Cotton began discussing the prospect of discharging Constant with Human Resources and with Hayes. The decision was driven, according to Cotton,

8

by "[c]ontinued decline in her performance to the point where she was not producing. The quality of her work and her productivity were unacceptable. They did not meet the standards of her job." (Cotton Dep. 40:13-16, June 3, 2004.) Constant's "workplace behavior" was a factor in the decision, but not the most important consideration.[2] (*Id.* 40:18-20.)

On June 30, 2003, Hayes fired Constant. Mellon contends that her work performance, as a whole, had not improved and that the problems identified in the prior employment action warnings persisted.

## II.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. This case was properly before the District Court as a question arising under federal law. 28 U.S.C. § 1331. Our review of the District Court's grant of summary judgment is *de novo*. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002). We must view the evidence and draw inferences therefrom in the light most favorable to Constant, the non-moving party. *Id.* at 336. Summary judgment was properly granted if there is no genuine issue of material fact and Mellon is entitled to judgment as a matter of law. *Id.* at 337.

## III.

---

[2]Throughout the depositions in the record, Constant's interaction with fellow employees is described as anything from irritating to workplace-inappropriate. We have thoroughly reviewed the materials but have no need to reproduce them here.

An employer that terminates an employee in retaliation for having taken FMLA leave violates the FMLA itself and its implementing regulations. 29 U.S.C. § 2615(a); 29 C.F.R § 825.220(c); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 n.9 (3d Cir. 2004). Retaliation claims under the FMLA are governed by the burden-shifting paradigm first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 166 (1st Cir. 1998); *Sabbrese v. Lowe's Home Ctrs., Inc.*, 320 F. Supp. 2d 311, 324 (W.D. Pa. 2004); *see Conoshenti*, 364 F.3d at 147. First, the plaintiff must show a prima facie case 1) that she took FMLA leave; 2) that she suffered an adverse employment decision; and 3) that the adverse decision was causally related to her leave.[3] *Conoshenti*, 364 F.3d at 146. Successfully showing a prima facie case raises a presumption that the employer unlawfully retaliated against the plaintiff. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

To rebut that presumption, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* This burden is one of production, not persuasion. *Id.* The employer must set forth admissible evidence which, if true, would lead a reasonable factfinder to the conclusion that the employer's decision was not motivated by retaliation. *Id.* at 255. If the employer carries this burden, the presumption that it retaliated against the plaintiff for taking FMLA leave is rebutted. *Id.* For her case to survive, the plaintiff must show that the employer's stated

---

[3]The parties do not dispute that Constant took FMLA leave and that she suffered an adverse employment action in being terminated.

10

reason is pretext for unlawful retaliation. *Id.* at 256. She may make this showing by submitting evidence that allows a reasonable factfinder to infer that intentional discrimination was the more likely motivating factor, *id.*, or that the employer's proffered reason was "a *post hoc* fabrication," *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The burden of persuading the trier of fact that the employer discriminated against the plaintiff "remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Here, the District Court granted summary judgment because it found that Constant had not demonstrated the causation necessary to sustain a prima facie case of FMLA retaliation. The court further held that, even assuming she had met her initial burden, no reasonable jury could have found that Mellon's reason for firing her was pretextual. Because we agree that Constant has failed to show pretext we will affirm without addressing causation.

The standard for summary judgment when faced with a question of pretext was set forth in our decision in *Fuentes*. The plaintiff's burden on summary judgment is to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The plaintiff must produce a quantum of evidence sufficient to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or

11

otherwise did not actually motivate the employment action." *Id.* (internal citation omitted).

The plaintiff need not make this showing "in a vacuum"; if the defendant articulates more than one legitimate reason for an adverse employment action, the plaintiff may survive summary judgment by casting doubt on "a fair number of them." *Id.* at 764 n.7. To do so, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (internal quotations and citations omitted). It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made. *Id.* The plaintiff's own assessment of her work performance, similarly, is inapposite to this analysis. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 529 (3d Cir. 1993). "[T]he factual dispute at issue is whether discriminatory animus motivated the employer." *Fuentes*, 32 F.3d at 765.

Mellon's stated legitimate, non-discriminatory reason for terminating Constant is poor work performance. The components of her work performance at issue are the quality of her writing, her business judgment and communication with management regarding the SkillSoft contract, and her workplace demeanor. Mellon's primary reason for terminating Constant's employment is that her written work did not meet Mellon's standards for a Marketing Specialist. When an employer produces evidence that a

12

plaintiff was terminated "because of its view that the plaintiff lacked a particular

qualification the employer deemed essential to [her former] position, [the] court should

focus on the qualification the employer found lacking" in determining whether employees

who did not take FMLA leave were treated more favorably. *Ezold*, 983 F.2d at 528;

*accord Waldron v. SL Indus., Inc.*, 56 F.3d 491, 500 (3d Cir. 1995); *Fuentes*, 32 F.3d at

767. Thus, it is not for this or any court to say whether Constant was, in fact, a good

writer. The issues that we may decide are 1) whether her writing was judged in a manner

less favorable than the writing of a similarly-situated employee who did not take FMLA

leave or 2) whether Constant has shown sufficient evidence for a reasonable factfinder to

conclude that problematic writing was not the actual reason she was fired.

Constant does not argue that similarly-situated Mellon employees were judged

more favorably on any of the features of job performance in which she was found lacking.

Instead, she presents herself as her own comparator. She argues that her work was not

subject to the same kind of criticism before she requested FMLA leave in half-day

increments as it was after she requested such leave. This Circuit typically looks to an

external comparator in examining pretext on subjective criteria. *E.g.*, *Bray v. Marriott

Hotels*, 110 F.3d 986 (3d Cir. 1997); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d

Cir. 1997); *Waldron*, 56 F.3d at 500; *Fuentes*, 32 F.3d at 767; *Ezold*, 983 F.2d at 528.

Constant's personal assessment that her writing met Mellon's standards does not create a

contested issue of fact on this matter. *See Ezold*, 983 F.2d at 529. Similarly, the opinion

of an outside writing expert about the quality of Constant's writing is not helpful in our

13

analysis of whether *Mellon's* internal writing standards were applied to Constant in a non-retaliatory manner. Thus, the record does not support a finding that her supervisors made subjective judgments about her writing in a manner less favorable than they judged the writing of other Mellon employees who did not take FMLA leave.

Moreover, Constant has not shown evidence sufficient for a reasonable jury to conclude that the criticism of her writing was manufactured in retaliation for her requested FMLA leave. Three Mellon employees edited and criticized her work, Hayes, Cotton, and Bannon. The evidence of record contains allegations from Constant that only one of the three, Hayes, may have had a retaliatory motivation for increased criticism. There is no indication that the three editors conspired to attack her writing because Hayes did not approve of the manner in which she sought FMLA leave time. Additionally, Constant was on notice of certain problematic elements of her writing and editing skills before her FMLA request was made, as demonstrated by her January 2003 performance review. Constant has not adduced evidence sufficient for a reasonable jury to conclude that this reason for her termination was pretextual.

There are issues of fact regarding the other two elements of Constant's job performance, but they do not overcome the lack of evidence supporting Constant's claim that the criticism of her writing was pretext for retaliation. As to the SkillSoft contract, Constant and Hayes presented conflicting versions of the events leading up to that contract being signed, each supported by sworn testimony. We are required to view this conflict in the light most favorable to Constant as the non-moving party on this motion for

14

summary judgment. Her evidence, if believed, is sufficient to support the inference that Hayes censured her for her conduct in the negotiations only after she requested FMLA leave in a manner of which he did not approve. With respect to Constant's workplace demeanor, Mellon acknowledges that the last problematic outburst or discomfiting personal phone call that she made occurred in December 2002 and that she was fired in June 2003. The link between that phone call and her termination is tenuous at best. The record demonstrates that other Mellon employees did not always find her an enjoyable person with whom to work, but lacks evidence that her behavior was so offensive to provide a concrete basis for termination. Ultimately, however, the inferences of retaliatory action created by these two factors are too weak to truly cast doubt on Mellon's credibility. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Fuentes*, 32 F.3d at 765.

Constant has not shown that Mellon's assessment of the quality of her writing was a *post hoc* fabrication or did not actually motivate its decision to terminate her employment. She has not demonstrated weakness, implausibility, inconsistency, incoherency, or contradiction in Mellon's reasoning. Accordingly, Mellon is entitled to summary judgment.

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

15