

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-3-1997

# Keller v. Orix Credit Alliance, Inc.

Precedential or Non-Precedential:

Docket 95-5289

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Keller v. Orix Credit Alliance, Inc." (1997). *1997 Decisions.* Paper 27.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/27

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————

No. 95-5289

——————

FREDERICK F. KELLER

Appellant,

vs.

ORIX CREDIT ALLIANCE, INC.

Appellee.

——————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 93-cv-03466)

——————

ARGUED MARCH 6, 1996

BEFORE:  MANSMANN, ALITO and LEWIS, Circuit Judges.

(Filed February 3, 1997)

——————

Debra L. Raskin (ARGUED)
Vladeck, Waldman, Elias & Engelhard
1501 Broadway
Suite 800
New York, NY  10036

        Attorney for Appellant


Edwin M. Baum (ARGUED)
Solomon, Zauderer, Ellenhorn, Frischer & Sharp
45 Rockefeller Plaza
New York, NY  10111

1

Steven L. Lapidus
St. John & Wayne
Two Penn Plaza East
Newark, NJ  07105

Attorneys for Appellee

_____

OPINION OF THE COURT
_____

LEWIS, Circuit Judge.

In this age discrimination case, Frederick F. Keller appeals from the district court's grant of summary judgment in favor of his former employer, ORIX Credit Alliance, Inc.  Keller alleges that Credit Alliance violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq., by failing to promote him to the position of Chief Operating Officer, and then terminating his employment.  Keller makes three principal arguments:  first, that summary judgment was inappropriate because there was sufficient direct evidence of discrimination to create a material issue of fact as to the legitimacy of his discharge; second, that the district court required Keller to establish an impermissibly burdensome prima facie case under the McDonnell Douglas-Burdine line of authority; and finally, that the indirect evidence of discrimination, combined with evidence of pretext in Credit Alliance's proffered reason for his discharge, created a material issue of fact.

For the reasons set forth below, we will reverse the district court's grant of summary judgment.

I.

Credit Alliance is a commercial finance company that lends money to its customers for the lease or purchase of capital equipment. Credit Alliance profits by borrowing money at one interest rate, and lending it to its customers at a higher rate. As of September, 1989, Frederick Keller was an Executive Vice President and Director of Credit Alliance. His primary responsibility was to raise the funds that Credit Alliance intended to lend to its customers. Keller became responsible for raising capital when Credit Alliance was sold in September of 1989 by First Interstate Bancorp to the ORIX Group. When Credit Alliance was owned by First Interstate, First Interstate provided most of Credit Alliance's capital needs. When ORIX acquired Credit Alliance, however, it established a goal for Credit Alliance to develop as quickly as possible its own "credit facilities" in order to become financially independent from ORIX. In the interim, ORIX arranged to have First Interstate continue to provide working capital until Credit Alliance achieved financial independence.

Keller was responsible for spearheading the effort to acquire sufficient funding to achieve Credit Alliance's goal of financial independence. Before the ORIX acquisition, Keller estimated that it would require $1.5 billion to achieve financial independence from First Interstate, and that this was an attainable goal. Credit Alliance apparently adopted this figure and used it to critique Keller's performance based on his relative progress toward this figure.

3

For reasons contested by both parties, Keller never reached this goal. The most credit Keller was ever able to acquire for Credit Alliance was $785 million as of September, 1991. By September 1992, however, the credit available to Credit Alliance was reduced to $695 million because four of the seven lines of credit arranged by Keller were terminated. Credit Alliance contends that the reason Keller never reached his credit goal was because he was unreceptive to creative fundraising tools, lacked the initiative to pursue financing routes around the country, and lacked the diplomatic skills to negotiate with Japanese bankers. Keller argues that the economic recession, as well as many sources' unwillingness to lend to Japanese-owned firms because of the downturn in the Japanese economy, were the true reasons for his inability to reach the funding goal. Additionally, he points out that his job was to obtain financing on the most favorable terms, and that because of the recession, the financing provided by First Interstate was the most favorable.

In April of 1992, Daniel Ryan, Credit Alliance's Chief Executive Officer, met with Keller to discuss the financing effort. Ryan complained that he had not observed Keller traveling to develop relationships with bankers, and then allegedly stated, "If you are getting too old for the job, maybe you should hire one or two young bankers." Ryan admits saying "maybe you should hire one or two young bankers," but he denies saying "if you are getting too old for the job." Keller documented the contents of this meeting in his journal, including

4

the statement Ryan admits making, but the "if you are getting too old" part is not recorded in the journal.

According to Credit Alliance, Ryan and many members of the Board of Directors overseeing Credit Alliance became increasingly concerned about the progress being made toward financial independence. The parties dispute where these people placed the blame for the failure: Credit Alliance contends that on many occasions it warned Keller that his performance was unacceptable; in contrast, Keller maintains that while some board members expressed their concern as to the progress being made, they ultimately accepted Keller's assessment that the state of the economy made it impossible for him to secure financing on favorable terms.

In May of 1992, Ryan promoted Philip Cooper, age 43, to the position of Chief Operating Officer. In the 18 months before his promotion, Cooper had taken responsibility for a transaction resulting in a four million dollar loss to Credit Alliance, and his region had higher "past due" statistics than comparable regions. Despite the fact that Keller had expressed an interest in the position, Ryan did not consider Keller for Chief Operating Officer. According to Ryan, he was looking for someone with "line experience," and Keller was simply not qualified for the position.

In September of 1992, Ryan decided to terminate Keller. Ryan hired an executive search firm to find candidates for Keller's position. Among the criteria listed by the defendant in a potential candidate were "experience in implementing asset-

5

backed securitization programs and other creative forms of fund raising, strong skills in working with rating agencies and bankers, particularly Japanese bankers, and be result-driven." In April of 1993, Ryan officially terminated Keller. He offered Keller's failure to raise adequate financing and the resulting displeasure of the Board of Directors and other ORIX officers as the reason for Keller's termination.

At or shortly after the termination meeting, Keller, while negotiating the amount of his severance pay, asked Ryan if the reason for his dismissal was his age, and reminded Ryan of the alleged age comment. Ryan then replied that Keller should "do what he had to," because he had checked with their lawyer and been assured that they would have no problem with an age discrimination claim, but that he (the lawyer) could be wrong because he was just a lawyer.

Ryan hired Joseph McDevitt, age 46, to replace Keller. Within a year, McDevitt exceeded the $1.5 billion goal. The parties' briefs do not disclose whether or not the terms of the financing obtained by McDevitt were significantly more favorable than from First Interstate.

Keller subsequently brought suit against ORIX in federal district court alleging age discrimination under the ADEA and the NJLAD, for failing to promote him to the position of Chief Operating Officer a year prior to his dismissal, and for terminating him in 1993. In ruling on Credit Alliance's motion for summary judgment, the district court found that Keller had not established a prima facie case. According to the district

6

court, the age difference between Keller and his replacement was not sufficient to establish that he was replaced by someone significantly younger, and because the undisputed evidence demonstrates that Keller did not reach the financing goal, he was not qualified for the position. Keller v. Orix, No. 93-3466, slip op. at 8-9 (D.N.J. April 6, 1995). In the alternative, the court concluded that even if Keller had established a prima facie case, he did not establish that the legitimate business reason proffered by Credit Alliance was a mere pretext for discrimination. The court stated that:

> Keller's failure to make adequate progress towards the $1.5 billion independent financing goal is a legitimate business reason for his termination. * * * Keller's claim that it was impossible to raise sufficient funds is not persuasive in his attempt to prove that Credit Alliance's proffered reason for termination was merely pretext for discrimination.

Id. at 10. The district court, therefore, granted Credit Alliance's motion for summary judgment as to Keller's federal claims, and dismissed the pendant state law claim. This appeal followed.

## II.

The district court had jurisdiction pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1367. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we are required to apply the same test the district court should have utilized initially. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987) (in banc). In a discrimination case, we

7

must determine whether there is sufficient evidence to create a genuine issue as to whether the employer intentionally discriminated. Weldon v. Kraft, 896 F.2d 793, 797 (3d Cir. 1990). For a defendant-employer to succeed, it must show that "the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate or indirect evidence by showing that the proffered reason is subject to factual dispute." Id. (quoting Hankins v. Temple University, 829 F.2d 437, 440 (3d Cir. 1987)). We, of course, must examine the record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in his or her favor. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986) ("[a]ny doubt as to the existence of a genuine issue for trial should be resolved against the moving party."); 10A Wright & Miller, Federal Practice & Procedure § 2727 at 124-24 ("Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it."). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Robinson v. PPG Indus. Inc., 23 F.3d 1159, 1162 (7th Cir. 1994).

## III.

The Age Discrimination in Employment Act makes it unlawful to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Like other employment discrimination claims, claims under the ADEA can be established either by the presentation of direct evidence of discrimination under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), or from evidence which creates an inference of discrimination under the framework of McDonnell Douglas-Burdine.  Keller argues that there is sufficient evidence in this case to withstand a motion for summary judgment under either approach.[1]

A.    Mixed Motive under Price Waterhouse.

When an employee shows "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989) (O'Connor, J. concurring), the burden of persuasion shifts to the employer to show that even if discrimination was a motivating factor in the discharge, it would have made the same decision absent the discriminatory animus. Id. at 244-46; Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994).  As Justice O'Connor noted in her concurring opinion in Price Waterhouse:
Stray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotional decisions were based on

---

1.    For the purposes of summary judgment, whether Price Waterhouse or McDonnell Douglas-Burdine governs is not directly relevant.  In evaluating a motion for summary judgment, a court must simply determine whether there is sufficient evidence to create a material issue of fact as to whether the employer relied upon an illegitimate criterion in making its employment decision. For the sake of clarity, however, we will address the evidence in this case under both analytical frameworks.

> legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard . . . . What is required is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

Id. at 277 (O'Connor, J. concurring) (citation omitted). The Civil Rights Act of 1992 modified Price Waterhouse, making it unlawful for an illegitimate criterion to be a motivating factor for any employment practice, even though other factors may also have motivated the practice. 42 U.S.C. § 2000e-2(m). Accordingly, when an employee presents evidence that a decisionmaker relied upon an illegitimate criterion, summary judgment for the employer is rarely, if ever, appropriate.

Weldon, 767 F.2d at 797; Hankins, 829 F.2d at 440.

> A plaintiff who makes such a case in resisting the defendant's motion for summary judgment does not need the help of McDonnell Douglas to resist the motion. He walks as it were without crutches. For he has presented enough evidence to defeat a motion for summary judgment under the general test for the grant of such a motion . . .

Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990). As we have recognized, "[w]hen direct evidence is available, problems of proof are no different than in other civil cases." Chipollini, 814 F.2d at 896. The issue becomes whether or not the employer did in fact rely upon the illegitimate criterion, which "is precisely the sort of question which must be left to the jury." Siegel v. Alpha Wire Corp., 894 F.2d 50, 55 (3d Cir.

10

1990).  As the Court of Appeals for the Seventh Circuit has observed,

> When confronted with an action where there are two alleged motives for the dismissal, one legitimate and the other illegitimate, and there exists more than a modicum of evidence in support of the illegitimate motive, we conclude that the law is generally better served by having such cases examined in the crucible of a contested hearing.  A trial becomes appropriate to evaluate whether the employer is attempting to avoid liability based on an illegitimate motive by simply supplying a legitimate one at the summary judgment phase.

Visser v. Packer Engineering Associates, Inc., 909 F.2d 959, 961 (7th Cir. 1990).

Typically, what is commonly understood as direct evidence is not available because the decisionmaker "is unlikely to admit that he fired an employee because of age or sex."  Hook v. Ernst & Young, 28 F.3d 366, 374 (3d Cir. 1994).  "Employers are rarely so cooperative as to include a notation in the personnel file, `fired due to age,' or to inform a dismissed employee candidly that he is too old for the job."  Thornbrough v. Columbus & Greenville R.R., 760 F.2d 633, 638 (5th Cir. 1985).  Consequently, "circumstantial evidence `tied directly to the alleged discriminatory animus' is sufficient to constitute direct evidence justifying a burden-shifting instruction."  Id. (quoting Ostrowski v. Atlantic Mut. Ins. Companies, 968 F.2d 171, 182 (2d Cir. 1992)).

> If, however, the plaintiff's nonstatistical evidence is directly tied to the forbidden animus, for example policy documents or statements of persons involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of

> in the suit, that plaintiff is entitled to a
> burden shifting instruction.

Id. (quoting Ostrowski, 968 F.2d at 182) (emphasis added). The term "direct evidence," therefore, is an unfortunate misnomer. Id. In other words, to come within the Price Waterhouse framework, the evidence presented by the plaintiff need only reflect a discriminatory animus on the part of a person involved in the decisionmaking process. Id.; Armbruster, 32 F.3d at 778.

Keller provided evidence that reflects a discriminatory animus on the part of a person involved in the decisionmaking process. Keller testified that during the first meeting in which he was ever criticized about his job performance, Ryan specifically stated that "[i]f you are getting to old for the job, maybe you should hire one or two young bankers."[2]

Ryan's statement that Keller may be getting too old to do his job is sufficient evidence of discriminatory animus under Price Waterhouse.[3] First, as CEO of the company, Ryan is clearly

---

2. Credit Alliance argues that because the "too old" comment does not appear in Keller's contemporaneous notes, it should be disregarded. While this is certainly a powerful argument for a jury, Credit Alliance's argument goes to the weight of the evidence, and is a question for the finder of fact. Shager, 913 F.2d at 402 ("[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment. On a motion for summary judgment the ambiguities in a witness's testimony must be resolved against the moving party.").

3. The district court did not address Keller's claim that this comment is sufficient as direct evidence of discrimination or that it supports an inference of discrimination. Instead, the court does not appear to have focused upon the inferences and presumption that the nonmoving party is entitled to, and simply accepted Credit Alliance's interpretation of the statement as authorizing Keller to hire additional staff. See Keller, slip op. at 4.

a decisionmaker, and in this case has admitted that he was the principal decisionmaker in firing Keller. Second, it seems rather obvious that Ryan's suggestion that Keller may be getting too old to properly perform his job and that he hire younger bankers could reflect discriminatory animus toward Keller's age. Such a comment, if true, is by no means shrouded in ambiguity, and there is no evidence to suggest that it was stated facetiously. In addition, the comment was made during a conversation about Keller's performance. According to Keller, the comment was made at the meeting in which he was first informed that his performance was considered unsatisfactory. We can only conclude, therefore, that it was related to the decisionmaking process itself. Ryan himself admits (in fact argues) that he was critical of Keller's performance at the time this alleged comment was made. Finally, Ryan decided to fire Keller only a few months later. The age related comment, therefore, is probative of the factors considered in Ryan's decision to terminate Keller. See Robinson, 23 F.3d at 1165 (holding that comments about the company not keeping employees on until they reached sixty-five could not be considered stray remarks for the purposes of summary judgment); Shager, 913 F.2d at 402 (holding that comments including "These older people don't much like or much care for us baby boomers, but there isn't much they can do about it," constituted direct evidence at the summary judgment phase).

Credit Alliance argues that this statement is simply a stray remark, and is therefore not direct evidence of

13

discrimination. The thrust of its argument is that this was the only age related remark Keller could recall. A single comment, however, is not necessarily a stray remark merely because it was only uttered on one occasion. If the single comment is made by a decisionmaker and reflects a discriminatory animus toward the plaintiff in the decisionmaking process, it might well constitute direct evidence of discrimination. Price Waterhouse, 490 U.S. at 241 ("The critical inquiry . . . is whether [the illegitimate criterion] was a factor in the employment decision . . ."). Unlike hostile environment claims, Price Waterhouse considers only the nature and probative value of the alleged discriminatory comment, and not the frequency with which it was stated, because an employer's "[r]eliance on [illegal] factors is exactly what the threat of Title VII liability was meant to deter." Id. at 265 (O'Connor, J., concurring). As discussed above, the alleged age-related remark in this case was made by the principal decisionmaker during his critique of Keller's work performance, and could be interpreted as reflecting a negative attitude toward his age. Robinson, 23 F.3d at 1165 (holding that potentially age related comments made by the supervisor who decided to terminate the plaintiff were sufficient direct evidence of discrimination to survive summary judgment).

As we have stated, since "discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant . . ." Abrams v. Lightolier Inc., 50 F.3d 1204, 1215 (3d Cir. 1995). Because

14

Keller presented circumstantial evidence which could allow a jury to conclude that Ryan relied on an illegitimate criterion in making his employment decision, summary judgment was inappropriate.  Given this evidence, Credit Alliance's proffered legitimate reason for discharging Keller simply creates a material issue of fact, rather than demonstrating the absence of one.

B.    Pretext under McDonnell Douglas-Burdine.

While Price Waterhouse involves evidence which directly reflects discriminatory animus, cases under McDonnell Douglas-Burdine involve circumstances which, if left unexplained or without a credible explanation, allow a jury to infer discriminatory animus.  As the Supreme Court has noted, we are willing to presume this largely because we know

> from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.  Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978) (emphasis in original); Chipollini, 814 F.2d at 897.  The Supreme Court, therefore, established the now familiar shifting burdens of production.

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  Third,

15

> should the defendant carry this burden, the
> plaintiff must then have an opportunity to
> prove by a preponderance of the evidence that
> the legitimate reasons offered by the
> defendant were not its true reasons, but were
> a pretext for discrimination.

Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253-53 (1981) (citations omitted).  These shifting burdens "are designed to assure that the `plaintiff [has] his day in court despite the unavailability of direct evidence.'"  Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) (quoting Loeb v. Textron, Inc., 600 F.2d 1003, 1014 (1st Cir. 1979)).  In this case, the district court concluded that Keller failed to establish a prima facie case, and in the alternative that he failed to present any evidence that Credit Alliance's proffered reason was pretextual.  We disagree.

1.  The Prima Facie Case under the ADEA.

To establish a prima facie case of age discrimination under the ADEA, Keller must show:  (1) that he belongs to the protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment decision; and (4) that he was replaced by someone sufficiently younger to permit an inference of age discrimination or his employer continued to seek applicants from among those having his qualifications.  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Chipollini, 814 F.2d at 897.  See O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307 (1996).  According to the district court, Keller failed to demonstrate that he had been replaced by someone sufficiently younger or that he was qualified

16

for the position.  But as we have noted, "the prima facie case under the McDonnell Douglas-Burdine pretext framework is not intended to be onerous."  Id. at 728.  And as the Supreme Court has noted, all that is required is "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ."  Teamsters v. United States, 431 U.S. 324, 358 (1977).  For the following reasons, we conclude that the district court required Keller to establish an impermissibly demanding prima facie case.

A) Keller's Qualifications.

At the prima facie stage of the litigation, a plaintiff "only needs to demonstrate that [he] `possesses the basic skills necessary for the performance of [the] job.'"  Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (citations omitted).  As we have stated, a plaintiff's qualifications for purposes of proving a prima facie case is determined by an objective standard.  Sempier, 45 F.3d at 729; Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989).  Accordingly, the proper inquiry is whether Keller had the "objective experience and educational background necessary to qualify as a viable candidate for the position[] he held."  Sempier, 45 F.3d at 729.  Any subjective analysis of the employee's job performance is properly examined at the pretext stage of the litigation.  Id.; Weldon, 896 F.2d at 798.  Even arguably quantifiable measures such as "productivity" and "output" can constitute a "subjective determination by [the defendant] of the performance level [plaintiff] had to achieve."

17

Weldon, 896 F.2d at 799.  We rely upon objective factors alone because subjective evaluations "are more susceptible of abuse and more likely to mask pretext."  Id. at 798 (citing Fowle v. C & C Cola, 868 F.2d 59, 64-65 (3d Cir. 1989)).  Denying a plaintiff "the opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext."  Id.

When viewed in the light most favorable to the nonmoving party, Keller clearly established that he was objectively qualified for his position.  First, Keller's qualifications were easily established by the mere fact that he had held an executive position with Credit Alliance for over sixteen years.  Sempier, 45 F.3d at 729 ("Sempier had the objective experience and education necessary to qualify as a viable candidate for the positions he held.  He had held executive positions at J & H for over twenty years.").  In addition, Keller had served on the board of directors for over six years, and had been considered for the position of President of the company.  While it is, of course, possible for a company to employ an unqualified individual and promote him or her to the highest levels of management, it would be imprudent for us to presume such an unlikely scenario at the summary judgment phase.

We reached the same conclusion with similar facts in Sempier. In that case, we noted that:

the record of [the plaintiff's] twenty years employment
    as an executive, his record as Comptroller

18

and then Treasurer of J & H, his election to the Board on two occasions, and his appointment as Chief Financial Officer and then as Chief Administrative Officer leads to the almost inevitable inference that he was qualified for the position from which he was discharged.

Id. at 729. In this case, Keller's objective qualifications lead inevitably to the conclusion that he was qualified for the position from which he was discharged.

The district court found that Keller was not qualified for his job because he had failed to make adequate progress toward his stated goal of raising $1.5 billion. But while the amount of funds Keller actually raised is obviously measured by an objective standard, the question whether Keller made adequate progress toward his goal is an inherently subjective determination. In other words, whether Keller's progress can be considered adequate depends not only upon his results and the context in which those results were achieved, but whether Credit Alliance was satisfied with those results. A subjective analysis of Keller's performance and the reasons for his failure is misplaced at the prima facie stage. Weldon, 896 F.2d at 798-99 ("[W]hile objective qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the McDonnell Douglas analysis."); Fowler, 868 F.2d at 64-65.

A plaintiff need only demonstrate that he or she possessed the objective experience and education necessary to perform the job in question. Keller's education, promotions, and

19

more than sixteen years of service as an executive for Credit Alliance are sufficient to demonstrate that he was qualified for his position for purposes of establishing a prima facie case under the ADEA. The question whether Keller's performance in reaching Credit Alliance's funding goal was adequate is a subjective determination best left to the pretext stage under McDonnell Douglas-Burdine.[4]

B) Replaced by Someone Sufficiently Younger.

In order to establish a prima facie case, the plaintiff must also demonstrate that he or she was replaced by someone sufficiently younger to permit an inference of age discrimination. Sempier, 45 F.3d at 728. The district court found that Keller did not meet this requirement because he was replaced by someone only five years younger. Keller, slip op. at 8.[5] We disagree.

---

4.    The cases relied upon by Credit Alliance for the proposition that employees must demonstrate that they were performing their jobs adequately as an element of the prima facie case are readily distinguishable. In every case, the plaintiff conceded that his or her performance was deficient and offered no explanation for the poor performance. See Perry v. Prudential Bache Securities, Inc., 738 F. Supp. 843, 848 n.1 (D.N.J. 1989), aff'd without opinion, 904 F.2d 696 (3d Cir. 1990); Spangle v. Valley Forge Sewer Auth., 839 F.2d 171, 173-74 (3d Cir. 1988); Dale v. Chicago Tribune Co., 797 F.2d 458 (7th Cir. 1986). Credit Alliance's argument that Keller admitted that he was not qualified for the job is similarly misplaced. Although Keller admits that he did not reach the financing goal, he never admitted that he was unqualified, or that he was responsible for the failure to reach the target. Appellee's Br. at 26.

5.    Both the district court and Credit Alliance state the age difference between Keller and his replacement as four years. The evidence, however, clearly demonstrates that at the time Keller was fired, he was 51 and his replacement, Joseph McDevitt was 46.

20

Although the district court did not have the benefit of guidance from the Supreme Court on this particular issue at the time it rendered its decision, the Court has since held that there is no particular age difference which must be shown to make out a prima facie case. O'Connor, 116 S. Ct. at 1310 (holding that a plaintiff need not be replaced by someone outside the protected class to establish a prima facie case); Sempier, 45 F.3d at 729. In other words, "[t]here is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination." Barber v. CSX Distribution Servs., 68 F.3d 694, 699 (3d Cir. 1995). As we have noted:

> [d]ifferent courts have held, for instance, that a five year difference can be sufficient, Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981), but that a one year difference cannot. [Gray v. York Newspapers, Inc., 957 F.2d 1070, 1087 (3d Cir. 1992)].

Sempier, 45 F.3d at 729. See also Corbin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994) (finding evidence of pretext when a 53 year-old was treated more favorably than a 58 year-old employee). In order to establish a prima facie case, the evidence need only create an inference of discrimination if the employer's actions are left unexplained. O'Connor, 116 S. Ct. at 1310. Accordingly, the "replacement by even an older employee will not necessarily foreclose prima facie proof if other direct or circumstantial evidence supports an inference of discrimination." Douglas v. Anderson, 656 F.2d at 533. As the Supreme Court has emphasized, "[t]he fact that one person in the

21

protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age."  O'Connor, 116 S. Ct. at 1310.

In Sempier, for example, we found that the plaintiff had established a prima facie case despite being replaced by someone only four years younger.  45 F.3d at 729-730.  Without deciding whether four years alone was enough, we concluded that the four year difference, combined with the fact that the plaintiff's functions were also temporarily transferred to someone well over ten years younger, were sufficient to establish a prima facie case.  Id.

We conclude that if left unexplained, the five year age difference between Keller and his replacement, when combined with the other elements of the McDonnell Douglas prima facie case standard, is sufficient to establish an inference that Keller's age was a motivating factor in Credit Alliance's decisions. Accord Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981). Given Keller's experience, and the fact that the age difference spans a difference in chronological decades, so to speak (Keller was in his "fifties" while his replacement was in his "forties"), this age difference is sufficient to support such an inference. See also Pace v. Southern Ry. System, 701 F.2d 1383, 1387 (11th Cir. 1983) ("Seldom will a sixty year-old be replaced by a person in the twenties.  Rather the sixty-year-old will be replaced by a fifty-five year-old, who, in turn, is succeeded by someone in the forties, who also will be replaced by a younger person.").

Finally, as we discussed above in the context of Price Waterhouse and will address below in the context of McDonnell Douglas-Burdine, the record contains evidence beyond the prima facie case that creates an inference of discrimination.  Ryan's alleged age-related comments support an inference that Credit Alliance's employment decisions with respect to Keller were based upon his age.  This renders the age of Keller's replacement less relevant for purposes of establishing a prima facie case. O'Connor, 116 S. Ct. at 1310 ("[T]he proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires `evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .'") (citation omitted).

In sum, because Keller has sufficiently demonstrated that he was qualified for the position from which he was discharged, that he was replaced by someone sufficiently younger, and there is additional evidence beyond the McDonnell Douglas-Burdine prima facie case standard from which a jury could conclude that Credit Alliance's employment decisions were motivated by Keller's age, the district court erred when it concluded that Keller failed to establish a prima facie case.

2.  Evidence Supporting An Inference of Discrimination.

The district court did not address Keller's claim that Ryan's comment was direct evidence of discrimination, apparently because it concluded that Keller had failed to provide sufficient evidence to demonstrate pretext under McDonnell Douglas-Burdine.

But even if we were to assume that Keller's evidence is insufficient under the Price Waterhouse standard, it is more than sufficient to withstand summary judgment under McDonnell Douglas-Burdine standard. First, because Keller offered evidence beyond the prima facie case from which an inference of discrimination could be drawn, Credit Alliance's proffered legitimate reason merely creates a material issue of fact as to whether the decision to terminate Keller was motivated by discriminatory animus. Waldron v. SL Indus., Inc., 56 F.3d 491, 495, 502-03 (3d Cir. 1995); Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Second, Keller has offered sufficient evidence that could support a finding that the proffered reason is pretext, which creates a material issue of fact as to the credibility of Credit Alliance's proffered reason.

A) Evidence of Discrimination.

We have consistently held that a plaintiff who has made out a prima facie case can defeat a motion for summary judgment by "adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764. We have also consistently held that since "discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant. . . ." Abrams, 50 F.3d at 1215. Evidence of age-biased comments made by a supervisor, therefore, could support an inference that the termination decision was made because of the

24

plaintiff's age.  Id. at 1214; Torre v. Casio, Inc., 42 F.3d 825,

834 (3d Cir. 1994); Armbruster, 32 F.3d at 783.

> Indeed, we have held that discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination.  See Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 54 (3d Cir. 1989) (finding age-biased comment relevant even when made subsequent to plaintiff's termination); Roebuck v, Drexel University, 852 F.2d 715, 733 (3d Cir. 1988) (upholding admissibility of discriminatory comment by decisionmaker made five years before denial of tenure).

Abrams, 50 F.3d at 1214.  When combined with Keller's prima facie

case, Ryan's suggestion that perhaps Keller was getting "too old"

for the job, and that maybe he should hire some "young bankers"

could clearly support an inference of discrimination.

This conclusion is supported by our prior decisions.

In Roebuck, we concluded that the comment that "in terms of

comparable white faculty members . . . blacks would cost Drexel

more money to hire those black faculty members," could give rise

to an inference of discrimination even when made five years

before the decision in question.  852 F.3d at 733.  In Lockhart,

we found that a reasonable jury could also consider the statement

"Westinghouse Credit was a seniority driven company with old

management and that's going to change, `I'm going to change

that,'" as evidence of age-bias.  879 F.2d at 54.  Similarly, in

Waldron we found that when combined with the plaintiff's prima

facie case, a comment that he should lose some weight because it

would make him healthier and look younger, made five months

before the termination, could support the conclusion that age was

more likely than not a determinative factor. 56 F.3d at 502. Likewise, an inference of discrimination was evident in Abrams, given comments like "things would hum around here when we got rid of the old fogies," and that two older employees were referred to as "a dinosaur" and "the old men." 50 F.3d at 1214. Finally, in Torre, we found that the statement "did you forget or are you getting too old, you senile bastard?" could reasonably lead to an inference of age based discrimination. 42 F.3d at 834. See also Robinson, 23 F.3d at 1165; Shager, 913 F.2d at 402-03.

Because Keller produced evidence that could support the conclusion that age was more likely than not a motivating factor in Ryan's decision to terminate him, Credit Alliance's proffered reason merely creates a material issue of fact for a jury to resolve. The district court's grant of summary judgment to Credit Alliance, therefore, was inappropriate. Credit Alliance failed to satisfy its burden of proving the absence of genuine issues of material fact.

B)  Evidence That the Employer's Proffered Reason Is Not Worthy Of Credence.

A plaintiff in an employment discrimination case may also defeat a motion for summary judgment by presenting evidence from which a reasonable factfinder could conclude that the defendant's proffered justifications are not worthy of credence. Torre, 42 F.3d at 832; Fuentes, 32 F.3d at 764 (legal principle reaffirmed in Sheridan v. E.I. DuPont de Nemours & Co., slip. op. at 12-13 (3d Cir. 1996) (en banc)). Credit Alliance's proffered reason for terminating Keller was his failure to make adequate

26

progress toward achieving their financing goal.  Credit Alliance argues, and the district court concluded, that Keller's evidence is aimed at simply demonstrating that this decision was wrong because, according to Keller, it was impossible to reach the goal.  Keller, slip op. at 10.  This misinterprets both Keller's evidence and argument.

Keller is not arguing that the proffered reason is pretextual because it is wrong.  He is arguing that Credit Alliance was aware of the outside factors which hindered his ability to obtain funding, and that they did not fault him for the results of his efforts.

While pretext is not demonstrated by showing that the employer was mistaken, Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), it can be established by "evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reason."  Sempier, 45 F.3d at 731 (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)) (emphasis added).  The thrust of Keller's argument and evidence is that Credit Alliance was not dissatisfied with his performance, because it knew that efforts to obtain outside fundraising were impeded by various market forces.

To support his claim that his performance did not play a role in Ryan's decision to fire him, Keller presented evidence that Credit Alliance's difficulty in obtaining greater financing was due to factors substantially beyond his control, and more importantly, that Credit Alliance recognized this fact.  Keller

27

argues that one of the reasons that Credit Alliance had difficulty obtaining new funding was that it had a poor credit rating which was influenced by its performance and the downturn of the Japanese economy. (Credit Alliance's parent company, ORIX, is a Japanese owned company.) To support his argument Keller submitted documents from several ratings agencies. Keller also submitted evidence which focused upon the banks' reluctance to do business with Credit Alliance because of its poor credit rating, the trouble with the Japanese economy, and Credit Alliance's level of delinquent accounts. In fact, several sources which decided to discontinue funding Credit Alliance justified their decision with these various reasons.

Keller also submitted affidavits and depositions to support his claim that he had informed the board of these difficulties and that the board accepted his explanation. In particular, one member of the board of directors specifically corroborates Keller's claim through December of 1991. According to the former director:

At the board of directors meetings, Keller described the obstacles in securing credit facilities including Credit Alliance's past due accounts and the company's status as a subsidiary of a Japanese corporation. No one challenged or disagreed with Keller's presentations at those meetings or suggested in any way that the difficulties he was encountering were in any way due to his performance rather than factors beyond his control.

A1126 (Affidavit of Neil Umhafer). In addition, Keller points to file memos that he sent to Ryan which detailed the bankers' statements that they would not lend to Credit Alliance because of

28

its Japanese parent company, the nature of Credit Alliance's business, or because of the conservative approach toward lending adopted by many in the credit market at the time.

Keller, therefore, relied upon evidence that could establish: (1) that Credit Alliance's disappointing progress was due to forces beyond his control; (2) that Credit Alliance recognized that fact; and (3) that it knew that its poor showing was not attributable to him. Seen in the light most favorable to Keller, a reasonable jury could consider Credit Alliance's explanation that Keller was fired for "poor performance" pretextual. Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987) (reversing summary judgment when the plaintiff proffered evidence "that his supervisors realized that the poor results were not his fault. . . . [T]he testimony of the movant's witnesses was inconsistent regarding whether they believed [plaintiff]'s performance caused the unsatisfactory job results."). See also Rhodes v. Guiberson Oil Tools, 75 F.3d 989 (5th Cir. 1996) (en banc) (holding that there was sufficient evidence to support a finding of discrimination when the plaintiff demonstrated that the employer's proffered explanation, poor performance, was pretextual because his poor results were due to the company's prices and a poor customer base); Johnson v. Group Health Plan, 994 F.2d 543, 546 (8th Cir. 1993) (report stating that morale problems caused by other factors created factual issue regarding plaintiff's performance); Mastrangelo v. Kidder, Peabody & Co., 722 F. Supp. 1126, 1133 (S.D.N.Y. 1989) (sufficient evidence that defendant's criticism of plaintiff's

29

performance was pretextual where problems of his department were attributable, at least in part, to matters beyond his control).

In further support of his claim, Keller points to the absence of any official criticism of his performance. In Sempier, we concluded that a genuine issue existed as to pretext because of the plaintiff's own testimony of satisfactory performance combined with evidence that he was not criticized while still employed. 45 F.3d at 721-32. The only evidence offered by Credit Alliance is the post-hoc deposition testimony of some of the members of the board of directors who ratified the decision to fire Keller. With the exception of Ryan's testimony and a purported comment made after Ryan decided to fire Keller, much of the evidence is ambiguous as to whether the statement represented criticism. For the most part, Credit Alliance asks us to infer that questions about the progress of the fundraising were criticisms of Keller's performance. For example, Credit Alliance points to the fact that one of its outside directors suggested that Keller be relieved of his duties as Chief Credit Officer so he could concentrate on raising funds, and asks that we consider this as "criticism" of Keller's performance. But that would require us to draw an unwarranted inference at the summary judgment phase, particularly in view of the fact that Keller offered evidence that when questioned about the progress, the board accepted his explanation that difficulties in the U.S. and Japanese economies made it difficult to secure funding on terms more favorable than the terms provided by their current source.

Finally, Keller argues that the district court improperly relied upon events that occurred after he was terminated (i.e., the success of his younger replacement), and also failed to acknowledge the role he played in those subsequent events. As an initial matter, we agree with Keller that the district court improperly relied upon his successor's performance. The fact that his successor reached Credit Alliance's goal has no bearing on whether the decision to fire Keller was motivated by discriminatory animus. "The employer could not have been motivated by knowledge it did not have, and it cannot claim that the employee was fired for the nondiscriminatory reason." McKennon v. Nashville Banner Publishing Co., 115 S. Ct. 879, 885 (1995).

We also agree that Keller's performance subsequent to Ryan's decision to terminate him is relevant for establishing pretext. Ryan testified that if Keller had come up with a plan and demonstrated some success in achieving it, he (Ryan) might have changed his mind. Keller provided evidence to demonstrate that he had done the preliminary work on some, if not all, of the means of financing that later proved to be successful. In particular, Keller points to evidence that he formulated a plan to achieve Credit Alliance's financing goal. In deposition testimony, Ryan admitted that the steps outlined in the plan provided by Keller were the ones followed by Credit Alliance in successfully raising funds in 1993 and 1994. For example, Keller briefed Ryan about the possibility of asset-backed securitization as a method of raising funds, and it was only months after Ryan

31

decided to fire Keller that Ryan decided to pursue this method. Keller also successfully secured a $100 million private placement which was the first step in improving Credit Alliance's credit rating. Despite Keller's plan and demonstration of success, however, Ryan terminated him. A jury could conclude that Keller played a significant role in Credit Alliance's subsequent ability to reach its funding goal, and that Credit Alliance's claim of poor performance, therefore, was pretextual.

Given this evidence, there is a material issue of fact as to whether or not Credit Alliance recognized the economic problems associated with the fundraising and whether or not Keller's performance, therefore, was the reason for his discharge. If a jury were to accept Keller's evidence and interpretation of that evidence, it could reasonably conclude that Credit Alliance did not in fact fire him based upon any dissatisfaction with his ability to raise financing. If a jury were to reject Credit Alliance's proffered reason, it could then reasonably conclude that Keller was terminated based upon his age. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, (1993). As material issues of fact remain in dispute, summary judgment in favor of Credit Alliance was inappropriate.

C. Failure to Promote.

The foregoing analysis of the evidence is applicable to both the wrongful discharge and the failure to promote claims, and will not be repeated here. We will, however, clarify several

32

additional points raised by Credit Alliance that relate specifically to the failure to promote.

Credit Alliance argues that Keller has not demonstrated that he was qualified for the position of Chief Operating Officer, did not apply for the position, and that he is estopped from asserting a discrimination claim because as a member of the board of directors he voted for Copper's appointment. We believe that there is sufficient evidence in the record for Keller's failure to promote claim to survive summary judgment. First, Keller clearly established a prima facie case that he was qualified for the position of Chief Operating Officer. Once again, the question is only whether he had the objective education and experience necessary. See supra section III.B.1.A. Second, Keller correctly argues that he was not required to apply for the position. "[I]t is sufficient to make out a prima facie case for a plaintiff to `establish[] that the company had some reason or duty to consider him for the post.'" Fowle v. C & C Cola, 868 F.2d at 68. Keller's senior management position, his prior consideration for the position of President of Credit Alliance, and Ryan's knowledge that Keller was interested in the Chief Operating Officer position are sufficient to establish a prima facie case as to this claim. Finally, there is no support for the argument that Keller is estopped from challenging his failure to be promoted because he voted with the other board members in ratifying Ryan's appointment. As Keller correctly notes, the equal employment laws do not impose a requirement of

33

contemporaneous complaint or repeated protests. See Townsend v. Indiana Univ., 995 F.2d 691, 693 (7th Cir. 1993).

Nor do we agree with Credit Alliance that its proffered justification for not considering or promoting Keller entitles it to summary judgment. According to Ryan, the position of Chief Operating Officer required line experience and a thorough understanding of the company's business, which he claims Keller lacked. As discussed above, Ryan's alleged statement that Keller may be too old to do his job, made only weeks before the promotion decision, is evidence from which a jury could infer discrimination. Similarly, Keller points to evidence from the Chair of Credit Alliance's predecessor company that he did, in fact, have a thorough understanding of the business and was considered a candidate for president of the company at the time Ryan was ultimately selected. In light of this evidence, a jury could conclude that Credit Alliance's claim that Keller was not qualified is pretextual. Consequently, there is sufficient direct, as well as indirect, evidence from which a jury could conclude that Keller was not promoted because of his age.

IV.

Because the district court also dismissed Keller's claims under the New Jersey Law Against Discrimination, we must briefly address the NJLAD claims. As the NJLAD and the ADEA "are governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.", Waldron, 56 F.3d at 503; Erickson v. Marsh & McLennan Co., 117 N.J. 539, 569 (1990); Clowes v.

34

<u>Terminix Int'l, Inc.</u>, 109 N.J. 575 (1988), our discussion of Keller's claims under the ADEA applies here as well, and the district court's grant of summary judgment as to the NJLAD claim will be reversed.

V.

To summarize, we find that there was sufficient direct and indirect evidence of discrimination for Keller's ADEA and NJLAD claims to survive summary judgment. We will, therefore, reverse the district court's judgment in its entirety and remand for further proceedings consistent with this opinion.

ALITO, <u>Circuit Judge</u>, dissenting.

I respectfully dissent for three reasons.

First, I disagree with the majority's holding that there is enough "direct" evidence of age discrimination to cause the burden of persuasion to shift to the company. Justice O'Connor's controlling opinion in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 276 (1989) (O'Connor, J., concurring in the judgment), concluded that, in order for the burden of persuasion to shift, "a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision." She explained that "[a]s an evidentiary matter, where a plaintiff has made this type of strong showing of illicit motivation, the factfinder is entitled to presume that the employer's discriminatory animus made a difference to the outcome, absent proof to the contrary from the employer." <u>Id</u>. She continued:

35

Thus, stray remarks in the workplace, while perhaps probative of [discrimination], cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria.  Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. . . . What is required is what Ann Hopkins showed here: direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

Id. at 277 (emphasis added; internal citation omitted); see also, Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994); Hook v. Ernst & Young, 28 F.3d 366, 373-76 (3d Cir. 1994);[6] Griffiths

---

6.  The majority states:  "`circumstantial evidence "tied directly to the alleged discriminatory animus" is sufficient to constitute direct evidence justifying a burden-shifting instruction.'"  Maj. Op. at 12 (quoting Hook, 28 F.3d at 374 (quoting Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992)).  This statement is inconsistent with Justice O'Connor's opinion in Price Waterhouse, with Hook, and with Ostrowski.  In order for the burden to shift, the plaintiff must not only show discriminatory animus on the part of a decisionmaker but must connect that animus to the challenged employment decision.  In Ostrowski, the court stated:

[I]f the plaintiff presents evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence is sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision, the jury should be instructed that if it does draw that inference the plaintiff is entitled to recover unless the employer has established by a preponderance of the evidence that the employer would have taken the same action without consideration of the impermissible factor.

968 F.2d at 182 (emphasis added); see also  Griffiths, 988 F.2d at 470.  The statement in Hook that the majority partially quotes was as follows:

36

v. CIGNA Corp., 988 F.2d 457, 469-70 (3d Cir.), cert. denied, 510 U.S. 865 (1993).[7]

In holding that the burden of persuasion should shift in this case, the majority relies solely on a remark allegedly made by Orix's chief executive officer, Daniel Ryan, about four or five months before Ryan decided that Keller should be terminated. In 1989, Keller was given and accepted the task of arranging for $1.5 billion in financing, but he never came close to that target. In April 1992, according to Keller's deposition, Ryan, who himself was more than 60 years of age, allegedly said to him: "If you are getting too old for the job, maybe you should hire one or two young bankers."[8] If Keller's account is believed, Ryan's remark is relevant to show age bias.

But "[n]ot all evidence that is probative of discrimination will entitle the plaintiff to [shift the burden of persuasion] to the defendant under Price Waterhouse." Griffiths, (..continued)
Ostrowski . . . recognizes that circumstantial evidence "tied directly to the alleged discriminatory animus" must be produced to justify a burden-shifting instruction.

28 F.3d at 374 (quoting Ostrowski, 968 F.2d at 182). This sentence stated that proof of discriminatory animus is necessary, and later Hook made clear that such proof is not sufficient. See 28 F.3d at 375 (statements by decisionmaker that were not "related to the decision process" not enough). But the majority confuses what is necessary with what is sufficient.

7. This portion of Griffiths was unaffected by Miller v. CIGNA, 47 F.3d 586 (3d Cir. 1995) (in banc).

8. Ryan denied saying anything about Keller's being too old, and Keller's contemporaneous notes of this conversation also omit this portion of Ryan's alleged remark. Keller's notes say simply: "He [Ryan] suggested I hire one or two young bankers." At the summary judgment stage, however, we must accept the version of the conversation set out in Keller's deposition.

37

988 F.2d at 470 (citation and internal quotation omitted); see also Hook, 28 F.3d at 374. Ryan's alleged remark does not constitute the type of "strong showing" that is needed to shift the burden of persuasion. The remark does not refer to the decision to fire Keller but rather to the hiring of "young bankers" to help him. See Hook, 28 F.3d at 375 (remarks did not shift the burden of persuasion because, "[a]lthough they were made by a decisionmaker, there is no evidence they were related to the decision process"). And according to Keller himself, the remark was uttered approximately four months before the decision to fire him was made. See id. (statements "temporally remote" from the challenged employment decision constitute weak evidence of bias in the decision making process). In order for the burden of persuasion to shift, "[w]hat is required is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." 490 U.S. at 277 (O'Connor, J., concurring in the judgment). Ryan's alleged remark does not meet this standard. Rather, it is an example of precisely the type of proof that Justice O'Connor found to be insufficient: a "statement[] by [a] decisionmaker[] unrelated to the decisional process itself. Id. The majority has not cited a single case holding that a remark like that attributed to Ryan is enough to shift the burden of persuasion.[9]

I submit that the majority's holding here is wrong.[10]

_____

9. The majority cites Robinson v. PPG Industries, Inc., 23 F.3d 1159 (7th Cir. 1994). See Maj. Op. at 14. In Robinson, however, the comments concerned discharge, see 23 F.3d at 1161–62, whereas here Ryan's alleged remark concerned the hiring of assistants for Keller. In addition, in Robinson, the remarks were allegedly

38

Second, I disagree with the majority's conclusion that the difference between Keller's age at the time of his firing (51) and that of his replacement (46) was "`sufficiently wide to give rise to an inference of discrimination.'"  Maj. Op. at 24 (quoting Barber v. CSX Distribution Serv., 68 F.3d 694, 699 (3d Cir. 1995).  When the Supreme Court crafted the McDonnell Douglas prima facie case, it apparently concluded that there were a

(..continued)
made on several occasions, both before and after the termination, see id. at 1164, and the remarks were broad statements that "could be construed as interpretations of a corporate goal to boot employees out before they retired." Id. at 1165.  In this case, Ryan allegedly made one comment, several months before he decided that Keller should be discharged, and the remark cannot be construed as involving a broad company policy.

The majority also cites Shager v. Upjohn Co., 913 F.2d 398 (7th Cir. 1990).  See Maj. Op. at 14.  But Shager did not hold that the remarks made by the supervisor in that case were sufficient to shift the burden of persuasion.  Instead, it held only that the remarks, together with evidence of pretext, was enough to defeat summary judgment under the McDonnell Douglas scheme.  See 913 F.2d at 402.

10.  The distinction between cases in which the discriminatory animus played a role in the employment decision and those in which it did not is critical because it fits into the notion that, in different sectors of the economy, market forces work differently to eradicate discrimination.  In sectors of the economy where the competitive pressures of the market work to ensure that even if an employer has a personal animus against a particular group, he will not exercise it because of a fear that such behavior will result in his producing lower quality products and being driven out of the market, one should be reluctant to impose the costs of legal regulation.  In other words, in these sectors, although employers might have irrational prejudices, they are unlikely to exercise them because of a fear of market discipline.

On the other hand, in those sectors of the economy where competitive pressures do not work as well and employers with a discriminatory animus feel that they can exercise it without the fear of being driven out of the market, there is a need for legal regulation.  See, e.g., Richard A. Posner, Aging and Old Age, 334-35 (1995).

number of employers who harbored a sufficient degree of racial prejudice that they would pass over better qualified African-American applicants in favor of inferior white applicants, even though it was contrary to the employers' economic interests to do so.  Thus, the rejection of a qualified African-American in favor of a white gave rise to an inference of discrimination and provided a reason for shifting the burden of production.  But is a similar inference reasonable when a 51-year old banker is replaced by a 46-year old in a decision made by a 60 year old?  Are there a significant number of employers who harbor such prejudice against 51-year old bankers, as opposed to 46-year old bankers, that they are willing to favor the 46-year olds over the 51-year olds, even though that will work against the employer's economic interests?  Cf. Posner, Aging and Old Age at 320 ("[T]he kind of `we-they' thinking that fosters racial, ethnic, and sexual discrimination is unlikely to play a large role in the treatment of the elderly worker") (footnote omitted); Thomas S. Ulen, The Law and Economics of the Elderly, 4 Elder L.J. 99, 124-25 (1996).  Moreover, isn't the replacement of 51-year olds with 46-year olds a sisyphean task?  After all, time's winged chariot hurries on; McDevitt, the 46-year old who was hired to replace Keller, recently turned 50 and by the time this case is over may well have achieved the milestone that allegedly resulted in Keller's demise.  Unlike the majority, I would hold that the age gap in this case is not wide enough to make out a prima facie case.[11]

---

11.  This case is distinguishable from Sempier v. Johnson &

Third, under the test set out in <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764-65 (3d Cir. 1994), which our <u>in</u> <u>banc</u> court reaffirmed in <u>Sheridan v. DuPont</u>, No. 94-7509, 1996 WL 659353, (Nov. 14, 1996), I do not think that the plaintiff adequately refuted the employer's legitimate reasons for his termination. Under this test, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. <u>Fuentes</u>, 32 F.3d at 764. Moreover, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken [but] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' . . . and hence infer 'that the employer did not act

(..continued)
<u>Higgins</u>, 45 F.3d 724, 730 (3d Cir.), <u>cert</u>. <u>denied</u>, 115 S.Ct. 2611 (3d Cir. 1995). There, the court held that the plaintiff had shown that his replacement was sufficiently younger by producing evidence that some of the plaintiff's duties were assumed by a person who was 10 years younger and some were assumed by a person who was four years younger. 45 F.3d at 729-30. Thus, the gap in <u>Sempier</u> is somewhat larger than the gap here, and I think that <u>Sempier</u> is a good place to draw the line.

<u>Id</u>. at 765 (emphasis in original; citation omitted).

41

for [the asserted] non-discriminatory reasons.'" Id. at 765 (emphasis in original; citation omitted).

In this case, I do not think that the plaintiff satisfied the first prong of the Fuentes test. The company says that it fired him because his performance was deficient, and it points to strong supporting evidence. As noted, Keller was supposed to raise $1.5 billion in financing, but he fell far short of this goal. Moreover, the company points to evidence that the goal was attainable: Keller's replacement met it in less than one year. In sum, there was a strong legitimate economic rationale for the employer to have made the decision it did. In our eagerness to ferret out and eradicate discriminatory abuse we must be careful not to deter employers from making legitimate business decisions.

The evidence adduced by Keller to show that this explanation was pretextual might at most be sufficient to raise a genuine question as to whether the company's evaluation of his performance was correct, but Keller's evidence does not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them `unworthy of credence.'" Id.

I also do not think that Keller satisfied the second prong of the Fuentes test, which requires "evidence . . . that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. Viewed together with the rest of the evidence, Ryan's alleged statement

is not sufficient to meet this requirement.  Thus, I do not think that Keller created a genuine question concerning the employer's proffered legitimate reason.  I would therefore affirm the decision of the district court with respect to both Keller's failure to promote and his discharge claims.